IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| DRM SALES & SUPPLY, LLC, | § | LEAD CASE NO. 16-70028 |
| | § | |
| DRM RENTAL PROPERTIES, LLC | § | SECOND CASE NO. 16-70029 |
| | § | |
| Jointly Administered Debtors. | § | CHAPTER 11 |
| | § | (Jointly Administered Under |
| | § | Case No. 16-70028) |

## DEBTORS' FIRST AMENDED JOINT DISCLOSURE STATEMENT TO ACCOMPANY DEBTORS' FIRST AMENDED JOINT PLAN FOR LIQUIDATION OF ESTATE ASSETS

NOW COME, DRM Sales & Supply, LLC ("DRM Sales") and DRM Rental Properties, LLC ("DRM Rental," and together with DRM Sales, the "Debtors"), the Debtors-in-Possession in the above-referenced bankruptcy proceedings, and file this First Amended Disclosure Statement to accompany their First Amended Joint Plan for Liquidation of Estate Assets (the "Plan"). The Disclosure Statement information is intended to solicit the acceptance of the Plan by persons who are entitled to vote on confirmation or rejection of the Plan.

## ARTICLE I
## INTRODUCTORY STATEMENT AND DISCLOSURES

DRM Sales and DRM Rental filed for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Midland Division (the "Bankruptcy Court"), on February 26, 2016 (the "Petition Date"). Since that time, the Debtors have continued to operate as Debtors-in-Possession pursuant to the provisions of Sections 1107 and 1108 of the Bankruptcy Code.

Pursuant to the terms of the Bankruptcy Code, this Disclosure Statement has been approved by the Bankruptcy Court. Such approval is required by statute and will not constitute a judgment of the Bankruptcy Court as to the desirability of the Plan or as to the value or suitability of any consideration offered thereby.

Contained in the packet of documents which has been sent to you by the Debtors is the Disclosure Statement, the Plan, the Ballot for Voting on the Plan (the "Ballot") and the Order Approving Disclosure Statement and Fixing Time for Filing Acceptance or Rejection of Plan, Combined with Notice Thereof.  Please read all of these materials carefully.  Please note that in order for your vote to be counted, you must: 1) include your name and address, 2) fill in, date, and sign the

enclosed Ballot and 3) return it to the attorney for the Debtor by the date and time specified on the Ballot.

### A.     THE PLAN OF LIQUIDATION

Purpose of the Plan.  The Debtors have filed contemporaneous hereto its First Amended Joint Plan of Liquidation. The purpose of the Debtors' Plan is to provide a method for the orderly liquidation of all of the Debtors assets. The Plan was developed by the Debtors with input from the Committee and proposes, among other things, the means by which all Claims against the Debtors will be finally resolved and treated for distribution purposes, consistent with the provisions and priorities mandated by the Bankruptcy Code.  The Plan is essentially a new contract between the Debtors and its Creditors, proposed by the Debtors to its Creditors for approval.  Creditors approve or disapprove of the Plan by voting their Ballots on the Plan, if they are in a Class entitled to vote, and, if appropriate, by objecting to confirmation of the Plan.  However, the Plan can be confirmed by the Bankruptcy Court even if less than all Creditors or Classes accept the Plan and, in such an instance, the Plan will still be binding on those Creditors or Classes that reject the Plan.  Approval and consummation of the Plan will enable the Bankruptcy Case to be finally concluded.

The Debtors believe that the Plan is more attractive than other alternatives, such as conversion to Chapter 7 liquidation or dismissal of this Bankruptcy Case.  The alternatives to the Plan are more fully discussed in this Disclosure Statement in Article IX of this Disclosure Statement. EACH CREDITOR IS URGED TO READ THE PLAN PRIOR TO VOTING.

### B.     THE DISCLOSURE STATEMENT

Why You Have Received This Disclosure Statement.  You have received this Disclosure Statement because the Debtors have proposed a Plan with the Bankruptcy Court to satisfy its debts and provide for a liquidation of their assets.  The Bankruptcy Court held a hearing and approved this Disclosure Statement onSeptember 27, 2016.  A copy of the Plan is enclosed with the materials that you have received.  This Disclosure Statement, as required by 11 U.S.C. § 1125, is being provided to all known Creditors and other parties-in-interest whose claims are impaired in connection with the solicitation and acceptance of the Plan proposed by the Debtor.

Purpose of this Disclosure Statement.  The purpose of this Disclosure Statement is to provide such information as will enable a hypothetical, reasonable investor typical of the Holders of Claims against the Debtors to make an informed judgment in exercising its right either to accept or reject the Plan.

Sources of Information.  The information contained in this Disclosure Statement has been submitted by the Debtors unless specifically stated to be from other sources.  Certain of the materials contained in this Disclosure Statement are taken directly from other, readily accessible instruments or are digests of other instruments.  While the Debtors have made every effort to retain the meaning of such other instruments or the portions transposed, the Debtors urge that any reliance on the contents of such other instrument should depend on a thorough review of the instruments

themselves.

Only Authorized Disclosure. No representations concerning the Plan are authorized by the Debtors or the Bankruptcy Court other than as set forth in this Disclosure Statement. Any representations or inducements made by any person to secure your vote which are other than herein contained should not be relied upon, and such representations or inducements should be reported to counsel for the Debtors, who shall deliver such information to the Bankruptcy Court.

Voting on the Plan. **YOUR ACCEPTANCE OF THE PLAN IS IMPORTANT.** A Creditor or Equity Interest Holder, in order to vote on the Plan, must have filed a proof of claim or interest on or before the Bar Date, unless the Debtor did not schedule the claim as Disputed, Unliquidated or Contingent. Any Creditor whose Claim is not scheduled as Disputed, Unliquidated or Contingent is, to the extent scheduled, deemed to have filed a Claim and, absent objection, such Claim is deemed Allowed. A Creditor or Equity Interest Holder may vote to accept or reject the Plan by filling out and mailing to counsel for the Debtor the Ballot which has been provided in this package of information.

In order for the Plan to be accepted by a class of Creditors, more than one half in number and at least two-thirds in amount of such class of Claims must vote to accept the Plan. Only those Claim Holders that actually vote are considered in the calculations. In order for the Plan to be accepted by Equity Interest Holders, at least two-thirds in amount of interests must vote to accept the plan. Again, only voting Equity Interest Holders are considered in the calculation. You are, therefore, urged to fill in, date, sign and promptly mail and/or fax the enclosed Ballot which has been furnished to you to counsel for the Debtors as follows:

David R. Langston
MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Facsimile: 806-765-0553

The Court has fixed November 1, 2016, as the last date by which Ballots must be served on counsel for the Debtors. Except to the extent allowed by the Bankruptcy Court, Ballots that are received after such time will not be counted. Ballots of Holders of Impaired Claims received pursuant to this solicitation and which are signed but are not expressly voted for acceptance or rejection of the Plan will be counted as Ballots for accepting the Plan. A Ballot accepting the Plan may not be revoked, except by order of the Bankruptcy Court.

Whether a Creditor votes on the Plan or not, each creditor will be bound by the terms and treatments set forth in the confirmed Plan that is accepted by the requisite majorities of creditors and is confirmed by the Court, or as confirmed by the Court pursuant to the provisions of 11 U.S.C. § 1129(b). Absent some affirmative act constituting a vote, a Creditor not voting on the Plan will not be included in the tally. Allowance of a claim for voting purposes does not necessarily mean that all or a portion of the claim will be allowed for distribution purposes.

You are urged to fill in, date, sign and properly mail in duplicate the enclosed ballot, which has been provided.  Be sure to properly complete and legibly identify the name of the creditor, the class in which you believe the claim is treated in the Plan, the amount of the claim, and indicate whether you are voting for or against confirmation of the Plan.  Representatives of the Debtors or creditors of the Debtors may solicit your vote.  The cost of any solicitation by the Debtors will be borne by the Debtors.  Likewise, the solicitation costs of competing plan proponents will be borne by the parties proposing the competing plan.

### C.     IMPORTANT DISCLOSURES

THIS DISCLOSURE STATEMENT IN SUPPORT OF THE DEBTOR'S FIRST AMENDED JOINT PLAN OF LIQUIDATION SUMMARIZES CERTAIN PROVISIONS OF THE DEBTORS FIRST AMENDED JOINT PLAN OF LIQUIDATION (THE "PLAN"), INCLUDING PROVISIONS RELATING TO THE PLAN'S TREATMENT OF CLAIMS AGAINST THE DEBTORS.  THE DISCLOSURE STATEMENT ALSO SUMMARIZES CERTAIN FINANCIAL INFORMATION CONCERNING THE DEBTORS AND CLAIMS ASSERTED AGAINST THE DEBTORS IN THE CHAPTER 11 CASES.  WHILE THE DEBTORS BELIEVE THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION WITH RESPECT TO THE INFORMATION SUMMARIZED, CREDITORS SHOULD REVIEW THE ENTIRE PLAN AND EACH OF THE DOCUMENTS REFERENCED HEREIN, AND SHOULD SEEK THE ADVICE OF THEIR OWN COUNSEL BEFORE CASTING THEIR BALLOTS.

**ONLY THOSE REPRESENTATIONS SET FORTH IN THIS DISCLOSURE STATEMENT ARE AUTHORIZED BY THE DEBTORS. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.**

**THE STATEMENTS CONTAINED HEREIN ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER DATE IS SPECIFIED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. THE DEBTORS ARE UNABLE TO GUARANTEE THAT THE INFORMATION CONTAINED IN THE PLAN AND THIS DISCLOSURE STATEMENT IS ENTIRELY WITHOUT ERROR, BUT ALL REASONABLE EFFORTS HAVE BEEN MADE TO ENSURE THAT ALL REPRESENTATIONS ARE AS ACCURATE AS POSSIBLE AS OF THE DATE OF ENTRY OF AN ORDER APPROVING THIS DISCLOSURE STATEMENT PURSUANT TO 11 U.S.C. § 1125.**

**THE SOURCE OF INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE DEBTORS OR THEIR AGENTS AND EMPLOYEES AND HAS NOT BEEN SUBJECT TO AN AUDIT UNLESS OTHERWISE SPECIFICALLY NOTED.  THE STATEMENTS MADE HEREIN LIKEWISE HAVE NOT BEEN VERIFIED BY DEBTORS' COUNSEL, ALTHOUGH AN ATTEMPT HAS BEEN MADE TO BE CONSERVATIVE**

AND REALISTIC. NEITHER THE DEBTORS NOR THEIR COUNSEL REPRESENT OR WARRANT THE ACCURACY OF DISCUSSIONS CONTAINED HEREIN REGARDING EVENTS.

AS STATED PREVIOUSLY, YOU ARE URGED TO REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT IN THEIR ENTIRETY PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN TO ENSURE A COMPLETE UNDERSTANDING OF THE TRANSACTIONS CONTEMPLATED UNDER THE PLAN AND HOW THOSE TRANSACTIONS WILL AFFECT YOUR CLAIM AGAINST, OR INTEREST IN, THE DEBTORS.

THE DEBTORS WILL SEEK CONFIRMATION UNDER THE CRAMDOWN PROVISION OF SECTION 1129(B) OF THE BANKRUPTCY CODE AND HEREBY GIVES NOTICE OF INTENT TO INVOKE THE CRAM DOWN PROVISIONS OF SECTION 1129(B).

## NOTICE OF HEARING ON CONFIRMATION

NOTICE IS HEREBY GIVEN THAT THE COURT HAS SCHEDULED A HEARING TO DETERMINE WHETHER OR NOT THE PLAN SHOULD BE CONFIRMED ON NOVEMBER 8, 2016, AT 1:45 P.M. IN THE UNITED STATES BANKRUPTCY COURTROOM, 100 EAST WALL STREET, ROOM P-126, MIDLAND, TEXAS 79701. YOU HAVE A RIGHT TO ATTEND THE HEARING AND PRESENT TO THE COURT YOUR ARGUMENTS EITHER IN FAVOR OF OR IN OPPOSITION TO CONFIRMATION OF THE PLAN.

NOTICE OF THE FIXING OF A BAR DATE AND THE REQUIREMENTS FOR FILING AND ALLOWANCE OF CLAIMS:

NOTICE IS HEREBY GIVEN that the Court set June 29, 2016 as the last day upon which proofs of claim or interests can be filed with the Court for the cases of DRM Sales & Supply, LLC and DRM Rental Properties, LLC.

DISCLOSURE OF EFFECT OF COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT AND OF THE ACCURACY OF THE REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT:

COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT OF ANY OF THE REPRESENTATIONS CONTAINED IN EITHER THE DISCLOSURE STATEMENT OR THE PLAN, NOR DOES COURT APPROVAL OF THE DISCLOSURE STATEMENT CONSTITUTE AN ENDORSEMENT OF THE PLAN ITSELF. APPROVAL OF THE DISCLOSURE STATEMENT BY THE COURT REPRESENTS A DETERMINATION THAT THE DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" OF A KIND, AND IN SUFFICIENT DETAIL, AS REQUIRED BY 11 U.S.C. SECTION 1125 AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND HISTORY OF THE DEBTORS AND THE CONDITION OF THE DEBTORS' BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL REASONABLE INVESTOR

TYPICAL OF HOLDERS OF CLAIMS OR INTERESTS OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN.

THE DEBTORS SEEK AN AFFIRMATIVE VOTE FROM EACH CLASS AND EACH HOLDER OF A CLAIM IN THESE BANKRUPTCY PROCEEDINGS. THE BALLOT WHICH YOU WILL RECEIVE PERMITS YOU TO ACCEPT OR REJECT THE PLAN.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS OR OBTAINED FROM THEIR RECORDS AND FILES. THE PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED UPON THE BEST INFORMATION AVAILABLE TO THE DEBTORS AT THE TIME THAT THE DISCLOSURE STATEMENT WAS PREPARED.

THE DEBTORS FAVOR ACCEPTANCE OF THIS PLAN AND BELIEVE THAT CONFIRMATION OF THIS PLAN WOULD REALIZE PAYMENT OF LARGER DIVIDENDS TO CREDITORS THAN COULD BE OBTAINED THROUGH A CHAPTER 7 LIQUIDATION. SUCH CONCLUSION IS BASED ON INFORMATION IN THE POSSESSION OF THE DEBTORS AT THE TIME THE DISCLOSURE STATEMENT AND PLAN WAS PREPARED.

WHILE THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED OR VERIFIED EXCEPT WHERE SPECIFICALLY STATED, AND THE RECORDS KEPT BY THE DEBTORS ARE NOT REPRESENTED TO BE WITHOUT ANY INACCURACY OR OMISSION, THE DEBTORS FIRMLY BELIEVE THAT EVERY EFFORT HAS BEEN MADE TO BE ACCURATE AND COMPLETE.


## ARTICLE II
## DEFINITIONS

In addition to terms defined elsewhere in this Disclosure Statement, the following terms, as used in this Disclosure Statement, shall have the following meanings, and such meanings shall be equally applicable to the singular and plural forms of the terms defined, unless the context otherwise requires. Further, terms which are used in this Disclosure Statement which are defined in Article II of the Plan shall have the meaning ascribed to them in the Plan and shall have the same meaning in this Disclosure Statement. A copy of the Plan is included in the materials you received. If you did not, for whatever reason, receive a copy of the Plan, or your copy of the Plan is illegible, you may contact counsel for the Debtors, David Langston, at P.O. Box 2585, Lubbock, Texas 79408-2585, Facsimile (806) 765-0553, email at drl@mhba.com in writing and transmitted via facsimile, email or mail to request another copy of the Plan.

Voting Deadline: _____ November 1, 2016 at 5:00 p.m. (CST).

# ARTICLE III
## DEBTORS' BACKGROUND INFORMATION

## A.   HISTORY OF THE DEBTORS

DRM Sales is a Texas limited liability company that owns and operates an oil and gas supply company located in Midland, Texas. DRM Sales primarily buys and distributes steel casing, tubing, and other such supplies used in the drilling operations of oil rigs engaged in the exploration for oil and gas throughout the United States. During the recent boom of oil exploration and production experienced in the Permian Basin and other parts of the United States, DRM Sales had annual revenues greater than $65 million in as recent as 2013, 2014, and 2015.

DRM Rental is a Texas limited liability company that owns a large office building, warehouse, truck shop, and storage yard facility located at 7100 W. Interstate 20, Midland, Midland County, Texas ("DRM Yard") and comprises of approximately 12 acres. DRM Rental rents the DRM Yard to DRM Sales and two affiliated companies DRM Transportation Services, LLC and DRM Management Corporation, Inc. DRM Rental also owns and operates a trailer park located in Midland, Texas, which it rents space to third parties, along with four modular houses.

To finance its operations, both DRM Sales and DRM Rental executed promissory notes, a deed of trust, and security agreements with Community National Bank, Midland, Texas. DRM Sales had a $12,000,000.00 line of credit with Community National Bank, Midland, Texas which it used to purchase inventory and cover operating expenses (the "LOC"). Community National Bank holds liens against DRM Sales' oilfield pipe and tubular products inventory, accounts receivable, and accounts held at Community National Bank. At the time that DRM Sales filed for bankruptcy, DRM Sales had drawn against the LOC in the approximate amount of $11,422,812.51, according to the proof of claim filed by Community National Bank in the DRM Sales bankruptcy case. The amount DRM Sales could borrow on the LOC was based on a borrowing base comprised of a certain percentage of the value of DRM Sales' inventory and accounts receivable. West Texas National Bank, Midland, Texas holds a 35% participatory interest in the LOC with Community National Bank.

DRM Rental executed a promissory note in favor of Community National Bank for the purchase and construction of the DRM Yard ("DRM Yard Note"). To secure the DRM Yard Note, DRM Rental granted Community National Bank a deed of trust lien against the DRM Yard, as well as some equipment installed in the DRM Yard. At the time that DRM Rental filed for bankruptcy, the DRM Yard Note had an outstanding balance of principal and interest in the amount of $4,110,517.34, according to the proof of claim filed by Community National Bank in the DRM Rental bankruptcy case.

## B.    EVENTS LEADING TO BANKRUPTCY

Towards the end of 2014 and throughout 2015, the oil and gas industry throughout the United States, and particularly in the Permian Basin area of West Texas, experienced significant economic distress due to the precipitous decline in crude oil prices. Crude oil prices that had risen as high as $100 per barrel over the past eight years started dropping in October of 2014 and dropped all the way below $30 per barrel. In recent months since the filing of the Debtors' bankruptcy cases, crude oil prices have risen slightly, but remain around $40.00 to $50.00 a barrel. During the boom period demand for oil and gas casing pipe, tubing, and other supplies sky-rocketed. This created significant growth in the volume of sales and profits of DRM Sales. However, the rapid decline in crude oil prices has also caused a decrease in the volume of oilfield pipe sold as well as the price of all products sold by DRM sales.

The decrease in volume as well as the prices for the products DRM Sales sold to customers caused the company to be out of compliance with the borrowing base requirements stipulated in the notes and collateral documents in place between DRM Sales and Community National Bank. As a result, in early February of 2016 Community National Bank declared the DRM Sales Note in default and wrote letters to all of its customers instructing them to send all payments for outstanding invoices to a post office box controlled by Community National Bank. Community National Bank also took additional measures to collect its debt from DRM Sales, DRM Rental, and the other companies related to the Debtors. Community National Bank's actions caused the Debtors to file for chapter 11 bankruptcy on February 26, 2016 (the "Petition Date").

## ARTICLE IV
## ASSETS AND LIABILITIES OF THE DEBTORS

## A.    OVERVIEW AND SUMMARY OF ASSETS AND LIABILITIES OF DEBTORS

### *DRM Sales & Supply, LLC*

| ASSETS (As of Petition Date) | | |
|---|---|---|
| Category | Description | Estimated Value |
| Vehicles, trucks, sport utility vehicles, etc. | 16 trucks and 3 sport utility vehicles | $224,600 |
| Financial assets | Cash, security deposits with utilities, and security deposits on leases | $1,164,360.01 |
| Accounts Receivable | Accounts receivable (book value less doubtful or uncollectible amounts) | $3,372,542.75 |
| **ASSETS (As of Petition Date)** | | |

| Category | Description | Estimated Value |
|---|---|---|
| Business-Related Property | Office furniture, fixtures, and equipment | $89,159.00 |
| Inventory | Oilfield casing, tubing, thread protector cages, wellhead casing equipment, and other supplies and products | $5,525,000.00 |
| Machinery | Fork lifts, front end loaders, pipe racks, pipe cat walks, thread protector baskets, rigmats, and other miscellaneous machinery | $284,514.27 |
| Real Property | Modular office building and double wide trailer/office | $28,000.00 |
| Notes Receivable | Amounts owed from related entities or insiders (book value less doubtful or uncollectible amounts) | $3,843,530.07 |
| **TOTAL OF REAL AND PERSONAL PROPERTY** | | **$14,531,706.10** |
| | | |
| **LIABILITIES (As of Petition Date)** | | |
| Category | Creditor and Type of Collateral | Amount of Indebtedness |
| Secured Creditor | Bank of the West secured by a 2011 Clark C25 FL-6809 | $9,509.64<br><br>Equity = -0- |
| Secured Creditor | Community National Bank secured by inventory, accounts receivable, accounts, and cash | $11,422,812.51<br><br>Equity = -0- |
| Secured Creditor | Ford Motor Credit secured by purchase money security interests in 2013 Ford F-150 and 2013 Ford Edge | $23,755.82<br><br>Equity = $4,244.18 |

| LIABILITIES (As of Petition Date) | | |
|---|---|---|
| Category | Creditor and Type of Collateral | Amount of Indebtedness |
| Priority Creditors | Employee Wages<br>Dallas County Tax Assessor<br>Internal Revenue Service<br>New Mexico Taxation & Revenue Department<br>Texas State Comptroller of Public Accounts | $449,592.21 |
| General Unsecured Claims | | $7,261,805.50 |

*DRM Rental Properties, LLC*

| ASSETS (As of Petition Date) | | |
|---|---|---|
| Category | Description | Estimated Value |
| Financial assets | Cash and security deposits with utilities | $20,883.74 |
| Real Property | Modular office buildings, modular homes, 12 acre business complex, and trailer park | $5,232,500.00 |
| Notes Receivable | Amounts owed from related entities or insiders (book value less doubtful or uncollectible amounts) | $0.00 |
| | | |
| LIABILITIES (As of Petition Date) | | |

| Category | Creditor and Type of Collateral | Amount of Indebtedness |
|---|---|---|
| Secured Creditor | Community National Bank secured by deed of trust lien against real property located at 7100 W. Interstate 20, Midland, Texas 79706 | $4,110,517.34<br><br>Equity= $989,482.66 |
| Priority Creditors | Internal Revenue Service | $206,730.00 |
| Claims of Insiders | Notes payable to DRM Logistics, LLC, DRM Sales, and DRM Transportation Services, LLC | $1,004,152.53 |

## B.     CLAIMS ASSERTED AGAINST THE DEBTORS

The Claims filed against the Debtors exceed $22 Million, not including additional scheduled Claims by the Debtors for which a Proof of Claim was not Filed. The chart in Article VI of this Disclosure Statement specifies the estimated amount of claims in each Class. The Claims filed against the Debtors have not necessarily become Allowed Claims. The Debtors are in the process of analyzing these Claims and may file objections to one or more such Claim. Pursuant to the Plan, the Liquidating Trust has one hundred eighty (180) days after the Effective Date to file any objections to Claims. The Claims Register is publicly available for viewing between the hours of 8:00 a.m. – 4:00 p.m. (CST) at the Bankruptcy Clerk's Office, Hipolito F. Garcia Federal Building and United States Courthouse, 615 East Houston Street, Room 597, San Antonio, Texas 78205 or electronically at pacer.txwb.uscourts.gov for a fee. The Claims Register may contain some Claims that have been paid, resolved in lower amounts, are duplicative, or are disputed by the Debtors and Committee. The Debtors reserve all rights to object to any and all Claims, liens and Equity Interests Filed or asserted against the Debtors or their property or property interests.

## C.     INTERCOMPANY AND INSIDER CLAIMS AND RECEIVABLES

DRM Sales' schedules show that Don Meek owes DRM Sales an amount not less than $2,270,000.00. The Debtors estimate that the approximately $1,135,000.00 is collectible (the "Meek Obligation"). Based on discussions with Don Meek's personal attorney, Randy Rouse, this loan relates to the winding down of one business entity at the time DRM Sales was organized to allow for DRM Management to retain the NOLs the wound down company had at the time of its dissolution. Mr. Meek, on account of these transactions, acquired a NOL for approximately $276,000, which resulted in a tax refund of approximately $187,000.

According to DRM Sales' schedules, DRM Transportation owes DRM Sales for intercompany loans (the "DRM Transportation Receivable"). The Debtors assert that the

Transportation Payable is approximately $1,806,383.05 and is related to intercompany loans between DRM Sales and DRM Transportation.

According to DRM Sales' schedules, DRM Rental owes DRM Sales for intercompany loans (the "DRM Rental Receivable"). The Debtors assert that the DRM Rental Payable is approximately $901,999.31 and is related to intercompany loans between DRM Sales and DRM Rental.

## D.    PENDING AND PREVIOUS LITIGATION

DRM Sales scheduled and removed to the Bankruptcy Court two collection actions on uncollected accounts receivable. These lawsuits and the rights to any recovery will be assigned to Community National Bank as part of the Global Settlement Agreement. The Bankruptcy Court set a status conference on these two matters which has been continued pending hearing on the motion to approve the Global Settlement Agreement.

DRM Rental removed to the Bankruptcy Court a lawsuit regarding the quieting of title to the Desert Rose Trailer Park. However, based on the agreement of the parties to the lawsuit, it has been remanded back to state court. DRM Rental has filed an application to employ Richard McKeel to prosecute this lawsuit in state court. Once his employment is approved, DRM Rental will file an agreed motion to lift the stay to continue to pursue this lawsuit.

As part of DRM Sales downsizing, DRM Sales has reduced its work force. On August 1, 2016, DRM Sales let go its Vice President of Sales, Fred Lundberg. After letting Lundberg go, DRM Sales learned that Lundberg organized a company called Aspen Pipe & Steel, LLC. Additionally, DRM Sales discovered that Lundberg while still employed by DRM Sales used company computers, company email, and company customer lists to solicit business for Aspen Pipe & Steel, LLC. DRM Sales believes this company is in direct competition with DRM Sales and believes that Lundberg has violated company policies damaging DRM Sales. Mr. Lundberg strongly denies the aforementioned allegations and cites to the recent decision by the Texas Workforce Commission Appeal Board wherein he was awarded unemployment benefits as evidence that rebuts the claims of misconduct raised by management of the Debtor. This potential claim against Lundberg will be transferred to the liquidating trust. In the event the liquidating trust determines not to pursue any claim against Lundberg, the claim against Lundberg will revest with DRM Sales.

Aside from the above described matters, the Debtor is unaware at this time of any other outstanding claims they may have against any Creditor, party-in-interest, or other third party. In the event the Debtors become aware of any claims, causes of action, or rights against any third party, such claims, causes of action or rights are hereby preserved and shall vest with the liquidating trust for the benefit of the Allowed General Unsecured Creditors for enforcement in accordance with the discretion of the liquidating trustee subsequent to the Effective Date of this Plan for a period of 180 days following the Confirmation Order.

Except as settled prior to or as a part of the Plan, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to Sections 544 and 548 of the Bankruptcy Code, all claims relating to post-petition transactions under Section 549 of the

Bankruptcy Code, all claims recoverable under Section 550 of the Bankruptcy Code, all claims against any third party on account of an indebtedness, not otherwise assigned to Community National Bank as part of the Global Settlement Agreement, or any other claim owed to or in favor of the Debtors, are hereby preserved and will vest with liquidating trust for enforcement in accordance with the discretion of the liquidating trustee subsequent to the Effective Date of this Plan for a period of 180 days following the Confirmation Order.

The Debtors, at this time, have not identified any claims or parties against whom the described claims exist, but the Debtors disclosed on their Statement of Financial Affairs transfers DRM Sales made to creditors and other parties within ninety (90) days prior to the Petition Date. According to the Debtors Statement of Financial Affairs, the following parties may be the subjec of Avoidance Actions:

| Name of Potential Defendant | Cause of Action | Est. Value |
|---|---|---|
| SB International, Inc. (affiliates) | Preference – 11 U.S.C. § 547(b) | $652,821.67 |
| Endurance Technologies, Inc. | Preference – 11 U.S.C. § 547(b) | $355,300.00 |
| CMC Cometals Steel | Preference – 11 U.S.C. § 547(b) | $231,512.80 |
| TMK Ipsco | Preference – 11 U.S.C. § 547(b) | $225,441.76 |
| Atlas Tubular, L.P. | Preference – 11 U.S.C. § 547(b) | $207,318.13 |
| Tejas Tubulars | Preference – 11 U.S.C. § 547(b) | 182,294.00 |

The Debtors note that DRM Sales listed payments to both DRM Transportation and DRM Management Corporation, Inc. ("DRM Management") during the ninety (90) days prior to the Petition Date. The majority of the payments to DRM Transportation relate to the payment of services performed by DRM Transportation for customers of DRM Sales. The customer would often pay all invoices directly to DRM Sales even though the invoices were from DRM Transportation. Therefore, DRM Sales would transfer these payments to DRM Transportation. Other payments made by DRM Sales to DRM Transportation were for services performed for DRM Sales' customers but billed to DRM Sales. The Debtors believe these payments may be subject to a defense for payments made in the ordinary course of business as the payments were made according to DRM Transportation's terms.

The payments made by DRM Sales to DRM Management arise from the DRM Management fee and the transfer of funds to cover DRM Sales payroll. DRM Management provides management services to DRM Sales and acts as the master payor of payroll for DRM Sales. Again, the Debtors believe any transfers made by DRM Sales to DRM Management may not be a preference at all because the transfers were not made on account of an antecedent debt. Also, the payments may be subject to a defense for payments made in the ordinary course of business as the payments were made according to DRM Management's terms.

Finally, there were transfers made to UPCO, Inc. during the ninety (90) days prior to the Petition Date. During the Bankruptcy Cases, UPCO, Inc. filed a motion to approve an administrative expense claim arising under section 503(b)(9) of the Bankruptcy Code. As part of the objections made to UPCO, Inc.'s motion, the Debtors investigated whether UPCO, Inc. had received preferential transfers. The Debtors believe that any transfers received by UPCO, Inc. during the ninety (90) day prior to the Petition Date are subject to a defense provided by the Bankruptcy Code.

The Debtors will transfer the right to investigate potential claims that may exist and to bring any claims against any third parties, not otherwise assigned to Community National Bank as part of the Global Settlement Agreement, to the liquidating trust. The Liquidating Trustee, without further order of the Bankruptcy Court, shall have the exclusive right to prosecute, settle, withdraw or release any such claim on behalf of the liquidating trust. All funds recovered from the litigation of any of these claims shall be distributed to the General Unsecured Creditors in addition to the payments proposed in the Plan.

## ARTICLE V
## SIGNIFICANT EVENTS DURING THE BANKRUPTCY CASE

### A.    FIRST DAY AND CASH COLLATERAL MATTERS

On February 29, 2016, shortly after the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, the Debtors filed (1) *Debtors' Motion for Joint Administration*; (2) *Debtors' Joint Emergency Motion for Authority to Use Cash Collateral*; and (3) *Motion of Debtors-in-Possession for Order Granting Debtors-in-Possession Authority to Pay (A) Prepetition Employee Wages, Salaries, and Related Items; (B) Prepetition Contributions to and Benefits under Employee Benefit Plan; (C) DRM Management Corp. Inc.'s Management Fee; and (D) All Costs and Expenses Incident to the Foregoing Payments and Contributions* (collectively, the "First Day Motions"). On March 2, 2016, the Court held a hearing on the Debtors' First Day Motions. After conducting the hearing, the Court granted the Debtors' First Day Motions. To adequately protect Community National Bank and West Texas National Bank (collectively, the "Secured Lenders") for the interim use of cash collateral, the Court granted the Secured Lenders replacement liens of like-kind and priority on DRM Sales' assets, liens against the tractor trucks, trailers, and vehicle equipment owned by DRM Transportation Services, LLC, a second lien against the DRM Yard and ordered that the debts be cross-collateralized, and a super-priority administrative expense claim. Since the first hearing on the interim use of cash collateral, the Secured Lenders and the Debtors have entered into four agreed orders on the continued interim use of cash collateral.

Subsequent to the hearing on the Debtors' First Day Motions, the Debtors, through their counsel and their representatives, in the first 30 days of the Bankruptcy Case, met with representatives of the U.S. Trustee's Office and, within 45 days of the Bankruptcy Case, appeared at a meeting held at an office of the U.S. Trustee, pursuant to Section 341 of the Bankruptcy Code, of which notice was provided to Debtors' known creditors at the time.

## B.     THE COMMITTEE

On March 29, 2016, the U.S. Trustee's Office appointed an official committee of unsecured creditors (the "Committee") in this case.

## C.     RETENTION AND PAYMENTS TO PROFESSIONALS

Employment of Mullin Hoard & Brown, L.L.P. as counsel for the Debtors.

On March 24, 2016, the Debtors filed their *Motion to Employ Mullin Hoard & Brown, L.L.P. as Counsel for the Debtors and for Authority to Draw Down Retainer*. As set forth in the motion to employ, Mullin Hoard & Brown, L.L.P. received a retainer in the amount of $60,000.00, $10,000 from the DRM Companies and $50,000 from Donald R. Meek, individually, prior to the filing of these Bankruptcy Cases. As part of the Debtors motion to employ Mullin Hoard & Brown, L.L.P., the Debtors sought authority to draw down on the retainer for work performed by Debtors' counsel prior to the filing of these Bankruptcy Cases and after the filing of the Bankruptcy Cases up to the date of the motion to employ. On April 25, 2016, the Court entered an order approving the employment of Mullin Hoard & Brown, L.L.P. for the Debtors, but denied without prejudice the relief requested by the Debtors to draw down on the retainer.

On July 22, 2016, the Debtors filed their *First Motion for Approval of Fees and Expenses and Request for Final Distribution of Retainer of Mullin Hoard & Brown, L.L.P., as Counsel for the Debtors*. In this motion, the Debtors sought approval of fees and expenses in the amount of $184,668.95. On August 18, 2016, the Court entered an order approving the fees and expenses of Mullin Hoard & Brown, L.L.P. and authorizing the law firm to apply the retainer in the amount of $59,938.51 against the balance of the fees and expenses owed, leaving a balance of $124,730.44 in fees and expenses remaining after application of the retainer.

On September 9, 2016, the Court entered the Agreed Order on the Official Committee of Unsecured Creditors' Motion to Convert Cases to Chapter 7, wherein the Debtors and the Committee agreed that from the Debtors' unencumbered funds the Debtors could pay an additional $62,365.22 towards the outstanding fees and expenses owed Mullin Hoard & Brown, L.L.P. At this time, the remaining balance owed to Mullin Hoard & Brown, L.L.P. for fees and expenses approved by the Court on August 18, 2016 is $62,365.22.

Employment of Pronske Goolsby & Kathman, P.C. as counsel for the Committee.

On May 5, 2016, the Committee filed its *Application of the Official Committee of Unsecured Creditors for an Order Authorizing the Employment of Pronske Goolsby & Kathman, P.C. as Counsel for the Committee*. On June 2, 2016, the Court entered an order authorizing the employment of Pronske Goolsby & Kathman, P.C. as counsel for the Committee. As of the filing of this Disclosure Statement, counsel for the Committee has not filed a fee application with the Court.

<u>Employment of PPL Group, LLC as Auctioneer for the Debtors</u>.

On August 15, 2016, the Debtors filed their *Motion to Employ PPL Group, LLC as Auctioneer for the Debtor*. As part of the employment of the PPL Group, LLC (the "PPL Group"), DRM Sales was to receive an advance of the sales proceeds in the amount of $500,000, which DRM Sales intended to use to meet a part of its obligations under the Global Settlement and Liquidation Agreement between it and the Secured Lenders. Therefore, the Debtors sought expedited consideration of the motion to employ the PPL Group, and on August 30, 2016, the Bankruptcy Court held a hearing on the Debtors' motion to employ the PPL Group. On August 31, 2016, the Court entered an order authorizing the employment of the PPL Group. DRM Sales has received the $500,000 advance from the PPL Group as provided in the order and the Auction Agreement.

<u>Employment of Richard McKeel as Special Counsel for DRM Rental</u>.

On August 15, 2016, the Debtors filed their *Motion to Employ Richard P. McKeel as Special Counsel for the Debtor*. On September 13, 2016, the Court entered an order authorizing the employment of Richard P. McKeel as Special Counsel for the Debtor. As of the filing of this Disclosure Statement, counsel for the Debtor has not filed a fee application with the Court.

### D.    CNB ADVERSARY

On March 1, 2016, Community National Bank filed its Original Complaint against DRM Sales for fraud commencing Adversary Proceeding No. 16-07003 (the "<u>CNB Adversary</u>"). On May 17, 2016, DRM Sales filed its Original Answer, Counterclaim, and Third-Party Complaint in the Adversary.

### E.    CNB SETTLEMENT

During the Chapter 11 Cases, the Debtors, the Secured Lenders, and counsel for the Committee have negotiated a settlement regarding the claims of the Secured Lenders, the Debtors' claims against the Secured Lenders in the Adversary, the disposition of certain assets securing the Secured Lenders' claims, and the continuance of the Debtors' business operations. The Debtors filed a Motion to Approve the Compromise or Settlement between the parties. The terms of the Global Settlement and Liquidation Agreement ("<u>CNB Settlement</u>") between the Debtors and the Secured Lenders provide as follows:

- DRM Sales shall turn over to Community National Bank all funds held in the West Texas National Bank account on the closing date (as defined in the CNB Settlement);

- DRM Sales shall turn over to Community National Bank all but $300,000.00 of the funds held in the Debtor-in-Possession Account at Frost Bank representing their collateral;

- DRM Sales, DRM Transportation Services, LLC, or both shall turn over to Community National Bank an aggregate of $200,000.00 in cash, consumer/passenger vehicles based on the appraised fair market value, or a combination of cash and vehicles;

- DRM Sales shall assign all of its rights, title, and interests in its pre-petition oilfield pipe, casing, and tubular products inventory (including post-petition oilfield pipe, casing, and tubular products purchased using the Secured Lenders' cash collateral) to the Secured Lenders;

- DRM Sales shall assign all of its rights, title, and interests in its pre-petition accounts receivable and post-petition accounts receivable generated from the sale of pre-petition inventory to the Secured Lenders;

- DRM Rental shall seek to either sell the DRM Yard or refinance the indebtedness owed to the Secured Lenders on the DRM Yard within six (6) months from the confirmation of the Plan;

- The Secured Lenders shall release and waive all claims to all adequate protection liens granted them in the cash collateral orders and shall waive any right to claim that the indebtedness between the Debtors and the Secured Lenders is cross-collateralized by the Debtors' assets;

- The Secured Lenders shall release and waive any claim to a super-priority administrative expense claim granted them in the cash collateral orders; and

- The Secured Lenders have agreed to waive any deficiency claim against the Debtors' bankruptcy estates, which the Debtors believe may be greater than $4,000,000.00.

The CNB Settlement was circulated to creditors and parties in interest pursuant to a Motion to Compromise under the provisions of Bankruptcy Rule 9019. A hearing was held by the Bankruptcy Court on August 18, 2016, to consider the Motion to Compromise and an order approving the CNB Settlement was entered on August 23, 2016. The closing between CNB and the Debtors to close the CNB Settlement took place on August 31, 2016, and its terms have now been implemented.

### F.     COMMITTEE'S MOTION TO CONVERT AND RESOLUTION

On August 17, 2016, the Committee filed its *Motion to Convert Cases to Chapter 7*. On August 26, 2016, the Debtors filed their *Response and Objection to the Official Committee of Unsecured Creditors' Motion to Convert Cases to Chapter 7*. On August 30, 2016, the Debtors and the Committee announced to the Court that an agreement had been reached between the parties regarding the Committee's motion to convert and the conversion of these cases. On September 8, 2016, the Court entered the *Agreed Order on the Official Committee of Unsecured Creditors' Motion to Convert Cases to Chapter 7*. Pursuant to the agreement of the parties, the Debtors are to file a plan of liquidation calling for the liquidation of the Debtors' assets and a disclosure statement to accompany the plan on or before September 15, 2016 containing the terms and provisions of the agreement between the Committee and the Debtors; seek approval of the Disclosure Statement on an expedited basis and at the earliest date possible; promptly solicit the plan and disclosure statement for voting, with confirmation of the plan to be held at the earliest date possible; and providing for the ceasing of operations of DRM Sales as set forth in the agreement between the Committee and the Debtors.

### ARTICLE VI
### SUMMARY OF TREATMENT UNDER THE PLAN

### A.     CLASSES AND DISTRIBUTIONS

The Plan separates Claims against the Debtors, the Estates and their property into Unclassified Claims and Classified Claims.

Unclassified Claims are generally post-petition Claims that must be paid in full and which do not vote on the Plan, and may consist of the following: (i) Allowed Administrative Claims; and (ii) Allowed Professional Claims.

Classified Claims and Interests are classified in the Plan under the provisions of Section 1122 of the Bankruptcy Code into the following classes and sub-classes:

<u>Classified Claims and Interests of DRM Sales.</u>

| | |
|---|---|
| Class A1.1: | Priority Tax Claims of Texas Comptroller (Unimpaired) |
| Class A1.2 | Priority Tax Claims of New Mexico Taxation and Revenue Department (Unimpaired) |
| Class A1.3: | Priority Tax Claims of IRS (Impaired) |
| Class A1.4: | Priority Non-Tax Claims (Unimpaired) |
| Class A2.1: | Ad Valorem Tax Claims of DRM Sales Prior to 2016 (Unimpaired) |
| Class A2.2: | Ad Valorem Tax Claims of DRM Sales of 2016 (Impaired) |
| Class A3: | Claims of Ford Motor Credit (Impaired) |
| Class A4: | Claims of Bank of the West (Impaired) |
| Class A5: | Claims of Community National Bank (Impaired) |
| Class A6: | Secured Claims of John Deere |

Class A7:        Secured Claims of RSP Permian, LLC
Class A8:        General Unsecured Claims (Impaired)
Class A9:        Subordinated Claims of DRM Sales (Impaired)
Class A10:       Equity Interests (Impaired)

Classified Claims and Interests of DRM Rental

Class B1:        Priority Tax Claims of IRS (Impaired)
Class B2:        Ad Valorem Tax Claims of DRM Rental (Impaired)
Class B3:        CNB
Class B4:        General Unsecured Claims (Impaired)
Class B5:        Subordinated Claims of DRM Rental (Impaired)
Class B6:        Equity Interests (Impaired)

The Chart below summarizes and demonstrates the classification and treatment of classified and unclassified Claims under the Plan. In preparing and submitting the chart, the Debtors emphasize and make clear the following:

- The chart is an estimate only, based on reasonable assumptions, but as an estimate it is subject to change and uncertainty based on future events.

- The deadline for filing prepetition Claims has expired, and the Debtors do not expect any late-filed Claims or their allowance.  However, the possibility does exist that a prepetition Creditor may attempt to file and recover on a Late-Filed Claim, which, if Allowed, could change the estimates.

- The Debtors reserve their right to object to any claim not Allowed in the Plan, and it informs all Creditors that it, or the Liquidating Trustee may prosecute multiple claim objections, including after the Effective Date, regardless of whether the affected creditor accepts the Plan (unless the Claim is Allowed in the Plan).

| DRM SALES CLAIMS AND CLASSES | | | | |
|---|---|---|---|---|
| **Category** | **Class** | **Impaired** | **Estimated Claims in Category** | **Estimated Recovery** |
| Allowed Administrative Claims | Unclassified | No | $375,500.00 | 100% |
| Priority Tax Claims of Texas Comptroller | Class A1.1 | No | 18,750.00 | 100% |
| Priority Tax Claims of New Mexico Taxation and Revenue Department | Class A1.2 | No | 25,290.73 | 100% |
| Priority Tax Claims of IRS | Class A1.3 | Yes | $206,730.09 | 0% |
| Priority Non-Tax Claims | Class A1.4 | No | $36,826.96 | 100% |
| Ad Valorem Tax Claims of DRM Sales Prior to 2016 | Class A2.1 | No | $16,305.54 | 100% |
| Ad Valorem Tax Claims of DRM Sales of 2016 | Class A2.2 | Yes | $405,644.04 | 100% |
| Secured Claims of Ford Motor Credit | Class A3 | Yes | $23,984.02 | 100% |
| Secured Claims of Bank of the West | Class A4 | Yes | $9,059.64 | 100% |
| Secured Claims of John Deere | Class A5 | Yes | $9329.91 | 100% |
| Secured Claims of RSP Permian | Class A6 | Yes | Unknown | Unknown |
| General Unsecured Claims | Class A7 | Yes | Approx. $7.6 Million | _____ |
| Subordinated Claims of DRM Sales | Class A8 | Yes | $74.01 | |
| Equity Interests in DRM Sales | Class A9 | Yes | N/A | Extinguished |
| DRM RENTAL CLAIMS AND CLASSES | | | | |
| **Category** | **Class** | **Impaired** | **Estimated Claims in Category** | **Estimated Recovery** |
| Priority Tax Claims of IRS | Class B1 | Yes | $206,730.09 | 0% |
| Ad Valorem Tax Claims of DRM Rental | Class B2 | Yes | Unknown | 100% |
| Secured Claims of Community National Bank | Class B3 | Yes | Unknown | Unknown |
| General Unsecured Claims | Class B4 | Yes | $1,935.00 | 0% |
| Subordinated Claims of DRM Rental | Class B5 | Yes | Approx. $1.9 Million | 0% |
| Equity Interests in DRM Rental | Class B6 | Yes | N/A | Extinguished |

## B.      TREATMENT OF UNCLASSIFIED CLAIMS UNDER THE PLAN

Administrative Claims and Deadline.  Holders of Administrative Claims of the Debtors that were incurred, accrued or in existence prior to the Effective Date, other than (a) a Professional Claim, (b) Allowed Administrative Claim as of the Effective Date, (c) Administrative Claim that represents a liability incurred and paid in the ordinary course of the Debtors' businesses, and (d) Administrative Claim based on a fee or charge assessed against the Estates under Chapter 123, Title 28, United States Code, must be filed by no later than the Administrative Claim Bar Date: (i) File an application with the Bankruptcy Court for allowance of the Administrative Claim; and (ii) serve a copy of such application on the Debtors, the Committee, the United States Trustee, and all other parties entitled to notice thereof. Failure to File and serve such application by the Administrative Claim Bar Date shall result in the Administrative Claim being forever barred and discharged. Except as specifically provided in the Plan, nothing in this Plan alters the law applicable to, and governing, the allowance of an Administrative Claim under the Bankruptcy Code and/or the Bankruptcy Rules.

Treatment of Administrative Claims and Professional Claims.  In full and final satisfaction of Allowed Administrative Claims, each Allowed Administrative Claim shall, unless otherwise agreed, be paid in full in cash by the Liquidating Trustee by the later of (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Administrative Claim; *provided, however*, that Allowed Administrative Claims that represent liabilities incurred on or after the Petition Date, but prior to the Effective Date, in the ordinary course of the Debtors' businesses which may be paid in the ordinary course of the Debtors' businesses without Order of the Bankruptcy Court, shall be paid in accordance with the agreements related thereto. Each Allowed Professional Claim, after deducting any retainer, shall be paid by the Liquidating Trustee the later of (i) five (5) Business Days after such Professional Claim is Allowed by a Final Order, or (ii) on such date as agreed by the Liquidating Trustee and the applicable Professional.

## C.      TREATMENT OF CLASSIFIED CLAIMS UNDER THE PLAN

The following is a summary of the treatment of the various classified claims under the Plan. It is important to note that the Plan provides the specific terms of the treatment, and that the Plan is the operative document that must be consulted for an exact understanding and explanation of the Plan's effect on classified Claims.  Furthermore, although the alleged liens and security interest of classified Creditors are described below, that description is not to be considered an agreement that any lien or security interest is valid, enforceable, perfected, and not avoidable by the Debtors, and this Disclosure Statement is without prejudice to those issues.  The Debtors reserve the right to contest the validity, extent, priority, perfection and avoidance of any alleged lien or security interest except where (i) a previous order of the Bankruptcy Court has been entered relating to the validity, enforceability, perfection and avoidance of a lien or security interest; or (ii) the Plan provides for the validity, extent, priority, perfection and non-avoidance thereof, including by allowing a fully secured claim or by releasing any potential lien or security interest holder.

### Class A1.1: Priority Tax Claims of Texas Comptroller

Class A1.1 consists of the Allowed Priority Tax Claims of the Texas Comptroller related to franchise taxes alleged by the Texas Comptroller. Specifically, Class A1.1 encompasses the Allowed Claim of the Texas Comptroller related to Proof of Claim No. 50 in the DRM Sales Claims Register. In full satisfaction, release and discharge and in exchange for the Class A1.1 Claim, the Texas Comptroller shall receive: (i) cash in the amount of the Allowed Class A1.1 Claim, without interest,

attorney's fees, or costs, on the later of (a) fifteen (15) days after the Effective Date if by then Allowed, or (b) fifteen (15) days after the Class A1.1 Claims becomes an Allowed Priority Tax Claims, or (ii) such other treatment as may be agreed upon in writing by the Texas Comptroller.

The Class A1.1 Claims are Unimpaired and shall be deemed to have accepted the Plan.

### Class A1.2: Priority Tax Claim of New Mexico Taxation and Revenue Department

Class A1.2 consists of the Allowed Priority Tax Claims of the New Mexico Taxation and Revenue Department. In full satisfaction, release and discharge and in exchange for the Class A1.2 Claim, the New Mexico Taxation and Revenue Department shall receive: (i) cash in the amount of the Allowed Class A1.2 Claim, without interest, attorney's fees, or costs, on the later of (a) fifteen (15) days after the Effective Date if by then Allowed, or (b) fifteen (15) days after the Class A1.2 Claims becomes an Allowed Priority Tax Claims, or (ii) such other treatment as may be agreed upon in writing by the New Mexico Taxation and Revenue Department.

The Class A1.2 Claims are Unimpaired and shall be deemed to have accepted the Plan.

### Class A1.3: Priority Tax Claims of IRS

Class A1.3 consists of the Allowed Priority Tax Claims of the IRS related to Proof of Claim No. 7 in the DRM Sales Claims Register. The Debtors heavily dispute any liability on this Claim and fully intend to object to the Claim to the fullest extent possible. To the extent the IRS is successful in defending its Claim, the Allowed Class A1.4 Priority Tax Claim shall be paid, (a) fifteen (15) days after entry of an order granting the IRS an Allowed Priority Tax Claim, either: (i) up to the Allowed amount of such Allowed Priority Tax Claim, or (ii) such other treatment as may be agreed upon in writing by the IRS.

The Class A1.3 Claims are Impaired.

### Class A1.4: Priority Non-Tax Claims

Class A1.4 consists of all Allowed Priority Non-Tax Claims. Each Class A1.4 Allowed Priority Non-Tax Claim shall be paid in full satisfaction, release and discharge of and in exchange for such Allowed Priority Non-Tax Claim: (i) the amount of such Allowed Non-Tax Priority Claim, in cash, and without interest, attorney's fees, or costs, on the later of: (a) fifteen (15) days after the Effective Date if by then Allowed, or (b) fifteen (15) days after such Allowed Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim; or (ii) such other treatment as may be agreed upon in writing by the holder of such Claim and the Committee.

The Class A1.4 Claims are Unimpaired and shall be deemed to have accepted the Plan.

### Class A2.1: Ad Valorem Tax Claims of DRM Sales Prior to 2016

Class A2.1 consists of Allowed Ad Valorem Tax Claims related to any tax year prior to 2016. Specifically, Class A2.1 includes Allowed Claims related to the following: (i) Claims of Dallas County alleged in Proof of Claim No. 8 in the DRM Sales Claims Register, (ii) Claims of Harris County alleged in Proof of Claim No. 31 in the DRM Sales Claims Register, and (iii) Claims of

Galena Park ISD alleged in Proof of Claim No. 46 in the DRM Sales claims Register. Each holder of an Allowed Ad Valorem Tax Claim in Class A2.1 shall receive in full satisfaction, release and discharge of and in exchange for such Allowed Ad Valorem Tax Claim, and the Lien(s) securing the same, cash in the full amount of their Allowed Claim, at the option of the Liquidating Trustee, by the later of: (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Ad Valorem Tax Claim.

The Class A2.1 Ad Valorem Tax Claims are Unimpaired and shall be deemed to have accepted the Plan.

## Class A2.2: Ad Valorem Tax Claims of DRM Sales of 2016

Class A2.2 consists of Allowed Ad Valorem Tax Claims related to 2016. Specifically, Class A2.2 includes Allowed Claims related to the following: (i) Claims of Midland County alleged in Proof of Claim No. 2 in the DRM Sales Claims Register (ii. Claims of Midland Central Appraisal District alleged in Proof of Claim No. 111 in the DRM Sales Claims Register, and (iii) Claims of Atascosa County alleged in Proof of Claim No. 15 in the DRM Sales Claims Register.

Treatment.  Unless otherwise agreed, each holder of an Allowed Ad Valorem Tax Claim in Class A2.2 shall receive in full satisfaction, release and discharge of and in exchange for such Allowed Ad Valorem Tax Claim, and the Lien(s) securing the same, cash in the full amount of their Allowed Claim, at the option of the Liquidating Trustee, by the later of: (a) fifteen (15) days after the Effective Date, or (b) fifteen (15) days after becoming an Allowed Ad Valorem Tax Claim.

Preservation of Liens.  Each holder of an Allowed Ad Valorem Tax Claim in Class A2.2 shall retain all liens in, to, or against any property of the Debtors and the Estates, such Liens shall continue to apply and attach to the Collateral with the same validity, extent, and priority as otherwise exists pending payment of each Allowed Ad Valorem Tax Claim in full, together with all applicable interest. Upon the payment of each Allowed Ad Valorem Tax Claim in full, together with all applicable interest, each lien securing such Allowed Ad Valorem Tax Claim shall be automatically, and without need for futher order, document, or action, released and discharged.

Impairment and Voting.  Class A2.2 is Impaired under the Plan.  Holders of Allowed Ad Valorem Tax Claims in Class A2.2 shall be entitled to vote to accept or reject the Plan.

## Class A3: Claims of Ford Motor Credit

Class A3 consists of the Allowed Secured Claims of Ford Motor Credit Company, LLC ("Ford"). More specifically, Class 3 consists of the claims alleged in Proofs of Claim 25 and 26 filed in the DRM Sales Claims Register.

Class A3(a).  The Class A3(a) Claim consists of Ford's Allowed Claim related to that specific 2013 Ford F-150, with a vehicle identification number ("VIN") 1FTFW1CT5DKD46656 and is the basis of Proof of Claim No. 25 in the DRM Sales Claims Register. Ford shall have an Allowed Secured Claim in an amount to be determined by the Bankruptcy Court, minus any post-petition adequate protection payments made by the

Debtors during the pendency of the Bankruptcy Cases related to the Class A3(a) vehicle. Pursuant to the August 15 Sale Motion, DRM Sales is selling various personal property, including the Allowed Class A3(a) vehicle. The proceeds from the sale of Class A3(a) vehicles shall be first used to satisfy the Class A3(a) Claim. To the extent the sale of the Class A3(a) fails to generate net proceeds sufficient to extinguish the Allowed Class A3(a) Claim of Ford Motor Credit Company, any unsecured deficiency claim will be treated as a General Unsecured Claim in Class A8 and paid in accordance with the treatment afforded all other creditors in Class A8.

Class A3(b). The Class A3(a) Claim consists of Ford's Allowed Claim related to that specific 2013 Ford Edge, with a vehicle identification number ("VIN") 2FMDK3KCXDBA68052 and is the basis of Proof of Claim No. 26 in the DRM Sales Claims Register. Ford shall have an Allowed Secured Claim in an amount to be determined by the Bankruptcy Court minus any post-petition adequate protection payments made by the Debtors during the pendency of the Bankruptcy Cases related to the Class A3(b) vehicle. Pursuant to the August 15 Sale Motion, DRM Sales is selling various personal property, including the Class A3(b) vehicle. The proceeds from the sale of Class A3(b) vehicles shall be first used to satisfy the Allowed Class A3(b) Claim. To the extent the sale of the Class A3(b) vehicle fails to generate net proceeds sufficient to extinguish the Allowed Class A3(b) Claims of Ford Motor Credit Company, any unsecured deficiency claim will be treated as a General Unsecured Claim in Class A8 and paid in accordance with the treatment afforded all other creditors in Class A8.

The Class A3 Claims are Impaired under the Plan.

### Class A4: Claims of Bank of the West

Secured Claim of Bank of the West. (Class A4) – Class A4 consists of the Allowed Secured Claims of Bank of the West and its affiliates, including Trinity. Bank of the West shall have an Allowed Claim in an amount to be determined by the Bankruptcy Court. Pursuant to the August 15 Sale Motion, the Debtor is selling various personal property, including the collateral securing the Class A4 Claim. The proceeds from the sale of collateral securing the Class A4 Claim shall be first used to satisfy the Class A4 Claim. To the extent the sale of the collateral securing the Class A4 Claim fail to generate net proceeds sufficient to extinguish the claims of Bank of the West, any unsecured deficiency claim will be treated as a General Unsecured Claim in Class A8 and paid in accordance with the treatment afforded all other creditors in Class A8.

The Class A4 Claims are Impaired under the Plan.

### Class A5: Claims of John Deere

Class A5 consists of the Secured Claims of John Deere. John Deere shall have an Allowed Secured Claim in an amount determined by the Bankruptcy Court. Pursuant to the August 15 Sale Motion, the Debtor is selling various personal property, including the collateral securing the Class A5 Claim. The proceeds from the sale of collateral securing the Class A5 Claim shall be first used to satisfy the Class A5 Claim. To the extent proceeds from the sale of the collateral securing the Class A5 Claim fail to generate net proceeds sufficient to extinguish the claim of Bank of the West, any

unsecured deficiency claim will be treated as a General Unsecured Claim in Class A7 and paid in accordance with the treatment afforded all other creditors in Class A7.

The Class A5 Claim is Impaired under the Plan.

### Class A6: Claims of RSP Permian, LLC

Class A6 consists of that portion of RSP Permian, LLC's Proof of Claim (Claim No. 39 in DRM Sales' Claim Register) alleged to be secured. RSP Permian, LLC shall have an Allowed Secured Claim, if any, in an amount determined by the Bankruptcy Court (the "RSP Permian Secured Claim"). On or before the date that is fifteen (15) days after entry of a Final Order Allowing the RSP Permian Claim, in full and final satisfaction, discharge, and release of the RSP Permian Secured Claim, the amount of the RSP Permian Secured Claim shall be offset against any other Claims RSP Permian may have against DRM Sales, including any Class A8 General Unsecured Claim.

The Class A67 Claim is Impaired under the Plan.

### Class A7: General Unsecured Claims of DRM Sales

Class A7 consists of all other Allowed Unsecured Claims against DRM Sales not placed in any other Class under the Plan. Each holder of an Allowed General Unsecured Claim shall receive, on account of its Allowed General Unsecured Claim, its Pro Rata share of Liquidating Trust Interests on the Effective Date (or as soon as reasonably practicable thereafter) and Distributions of Cash from the Distribution Reserve, subject to other applicable terms of this Plan and the Liquidating Trust Agreement.

The Class A7 General Unsecured Claims are Impaired under the Plan.

### Class A8: Subordinated Claims of DRM Sales

Class A8 consists of all Allowed Subordinated Claims against DRM Sales. Holders of Class A8 Claims shall not be entitled to receive any payments under the Plan until all Allowed Claims are paid in full.

The Class A8 Claims are Impaired under the Plan.

### Class A9: Equity Interests of DRM Sales

Class A9 consists of the holders of Equity Interests in DRM Sales. On the Effective Date, all such Equity Interests shall be deemed cancelled, extinguished, and otherwise rendered null, void and no further force or effect, whatsoever, except for the sole purpose of effectuating and wind-up and termination of DRM Sales pursuant to the provisions of this Plan, including the preparation and filing of final tax returns for DRM Sales.

The Class A9 Claims are Impaired under the Plan. Holders of Claims in Class A9 are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

**Class B1: Priority Tax Claims of IRS**

Class B1 consists of the Allowed Priority Tax Claims of the IRS related Proof of Claim No. 2 in the DRM Rental Claims Register. The claims asserted in Proof of Claim No. 2 in the Claims Register of DRM Rental are duplicative of the Class A1.34 Claims. The Debtors heavily dispute any liability on this Claim and fully intend to object to the Claim to the fullest extent possible. Because the IRS's claims are already treated elsewhere, the IRS shall receive no distributions on account of the Class B1 Claim.

The Class B1 Claim is Impaired under the Plan. On account of its Class B1 Claim, the IRS is conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, the IRS is not entitled to vote any Class B1 Claim.

**Class B2: Ad Valorem Tax Claims of DRM Rental**

Class B2 consists of the Ad Valorem Tax Claims related to the DRM Yard.

Treatment. Unless otherwise agreed, each holder of an Allowed Ad Valorem Tax Claim in Class B2 shall receive in full satisfaction, release and discharge of and in exchange for such Allowed Ad Valorem Tax Claim, and the Lien(s) securing the same, cash in the full amount of their Allowed Claim, by the later of: (a) fifteen (15) days after the Effective Date, (b) fifteen (15) days after becoming an Allowed Ad Valorem Tax Claim, or (c) the date of the closing of the sale of the DRM Yard.

Preservation of Liens. Each holder of an Allowed Ad Valorem Tax Claim in Class B2 shall retain all liens in, to, or against any property of the Debtors and the Estates, such Liens shall continue to apply and attach to the DRM Yard with the same validity, extent, and priority as otherwise exists pending payment of each Allowed Ad Valorem Tax Claim in full, together with all applicable interest. Upon the payment of each Allowed Ad Valorem Tax Claim in full, together with all applicable interest, each lien securing such Allowed Ad Valorem Tax Claim shall be automatically, and without need for further order, document, or action, released and discharged.

Impairment and Voting. Class B2 is Impaired under the Plan. Holders of Allowed Ad Valorem Tax Claims in Class B2 shall be entitled to vote to accept or reject the Plan.

**Class B3: Secured Claims of Community National Bank**

Class B3 consists of the Allowed Secured Claims of Community National Bank related to the CNB Real Estate Note.

CNB Real Estate Claim. CNB shall have an Allowed Secured Claim in the amount of $4,110,517.34 (the "CNB Real Estate Claim").

Treatment of Community National Bank's Real Estate Note. On or about July 22,

2016, the Debtors, DRM Management Corporation, Inc., DRM Transportation Services, LLC, DRM Logistics, LLC, Donald R. Meek, Community National Bank, and West Texas National Bank executed the CNB Settlement resolving all claims, causes of action, liens and encumbrances the parties may have against each other. On July 22, 2016, the Debtors filed a motion to approve the CNB Settlement under Bankruptcy Rule 9019 to resolve all claims and causes of action against the parties, and related entities to the Debtors, DRM Management Corporation, Inc., DRM Transportation Services, LLC, DRM Logistics, LLC, and Donald R. Meek. A hearing was held by the Bankruptcy Court on August 18, 2016, to consider the Motion to Compromise and an order approving the CNB Settlement was entered on August 23, 2016. The treatment to be afforded the CNB Real Estate Claim is intended to conform to the terms and provisions of the CNB Settlement. In particular as it pertains to the Real Estate Note, DRM Rental will market for sale the real property located at 7100 W. I-20, Midland, Texas or will obtain refinancing of the Real Property Note within six (6) months from the Confirmation Date of the Plan. While DRM Rental is marketing the property for sale or seeking to refinance the Real Property Note, DRM Rental shall continue to make the monthly payment required under the Real Estate Note to Community National Bank. Should DRM Rental sell the real property, Community National Bank shall have the right to credit bid its debt. Proceeds from the sale of the real property will first go to satisfy the Real Property Note. Remaining proceeds, if any, will be utilized by DRM Rental for payments under the Plan. In the event, a sale of the foregoing collateral is not closed within six (6) months of the Confirmation Date, the CNB Real Estate Note is not paid in full within six (6) months from the Effective Date of the Plan or should DRM Rental default in making the monthly payments due under the Real Estate Note then in such event Community National Bank shall be entitled to exercise all rights and remedies available to it including, but not limited to, foreclosing upon the DRM Yard and any related collateral pursuant to the terms of its deed of trust recorded against such real estate, pursuing any guarantors, and exercising its right to file a proof of claim for any deficiency balance owing on the indebtedness.

    <u>Preservation of Liens and Personal Guarantee</u>. CNB shall retain its liens in, to, or against the DRM Yard and related improvements, and any such Liens shall continue to apply and attach to the Collateral with the same validity, extent, and priority as otherwise exists pending payment of the CNB Real Estate Claim. Similarly, CNB's rights under the personal guarantee signed by Donald R. Meek are preserved and shall not be affected or released by confirmation of the Plan.

    <u>Impairment and Voting</u>. Class B3 is Impaired under the Plan and CNB shall be entitled to vote to accept or reject the Plan.

## Class B4: Claims of DRM Sales

    Class B4 consists of the intercompany Claims of DRM Sales against DRM Rental. Pursuant to the compromise and settlement described in Section 6.2.1 of this Plan, DRM Sales shall transfer the intercompany Claims of DRM Sales against DRM Rental to the Liquidating Trust, and the Liquidating Trustee shall pursue such Claims in accordance with the terms of the Liquidating Trust Agreement.

    The Class B4 Claim is Impaired.

### Class B5: General Unsecured Claims of DRM Rental

Class B5 consists of all other Allowed Unsecured Claims against DRM Rental not placed in any other Class under the Plan. Unless expressly treated Class B5 Claims shall be cancelled and released without any distribution on account of such Claims.

Class B5 Claims are Impaired under the Plan. Holders of Claims in Class B4 are are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

### Class B6: Subordinated Claims of DRM Rental

Class B6 Subordinated Claims of DRM Rental consist of all Allowed Subordinated Claims against DRM Rental. The Class B5 Claims shall be cancelled and released without any distribution on account of such Claims.

Class B6 Claims are Impaired under the Plan. Holders of Claims in Class B6 are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

### Class B7: Equity Interests in DRM Rental

Class B7 Claims consists of the holders of Equity Interests in DRM Rental. On the Effective Date, all such Equity Interests shall be deemed cancelled, extinguished, and otherwise rendered null, void and no further force or effect, whatsoever, except for the sole purpose of effectuating and wind-up and termination of  DRM Rental pursuant to the provisions of this Plan, including the preparation and filing of final tax returns for DRM Rental.

Class B7 Claims are Impaired under the Plan. Holders of Claims in Class B7 are conclusively deemed to have rejected the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

### D.    MEANS FOR IMPLEMENTING THE PLAN

Attached hereto as **Exhibit A** is a sources and uses analysis of the funds that the Debtors anticipate having at Confirmation, along with projected payments to be made to holders of Allowed Claims under the provisions of the Plan.

Sale of Certain Personal Property.

PPL Advance.  As part of the Auction Agreement with the PPL Group, the PPL Group will advance $500,000.00 in sales proceeds at the time the Court enters an order approving the PPL Group's employment and authorizing the auction of the Debtors assets. The Debtors will use up to $200,000.00 from the advance to fulfill its obligations under the CNB Settlement. The remaining $300,000.00 in advance proceeds shall be used to fund the Senior Claim Reserve.

Auction and Sale Proceeds.  The Net Personal Property Proceeds shall be used first to

fully fund the Senior Claims Reserve. Any Net Personal Property Proceeds remaining after the Senior Claims Reserve shall be used to fund the Liquidating Trust Expense Reserve. To the extent any Net Personal Property Proceeds exists after the Liquidating Trust Expense Reserve is fully funded, such Net Personal Property Proceeds shall be deposited in the Distribution Reserve.

<u>Compromises and Settlements.</u>

6.2.1 <u>DRM Rental and DRM Sales Intercompany.</u>  DRM Sales shall transfer the intercompany Claims of DRM Sales against DRM Rental to the Liquidating Trust, and the Liquidating Trustee shall pursue such Claims in accordance with the terms of the Liquidating Trust Agreement. Under the terms of the Plan, DRM Rental is not released from the intercompany payable it owes to DRM Sales and such intercompany payable is not subordinated to the claims of other Unsecured Creditors of DRM Rental.

<u>Creation of the Liquidating Trust.</u>

On the Effective Date, the Liquidating Trust Agreement shall be executed, and the Liquidating Trust shall be established and become effective. In accordance with this Plan and the Liquidating Trust Agreement, the Liquidating Trust shall be established for the purpose of (i) collecting, receiving, holding, maintaining, administering, and liquidating the Liquidation Trust Assets; (ii) making all payments and Distribution to holders of Allowed Claims in accordance with the terms of this Plan; (iii) closing the Bankruptcy Cases; and (iv) otherwise implementing the Plan and finally administering the Estates. The Liquidating Trust shall not engage in a trade or business and shall conduct its activities consistent with the Liquidating Trust Agreement. On and after the Effective Date, the Liquidating Trust shall perform and pay when due liabilities, if any, related to ownership or operation of the Liquidating Trust Assets.

<u>Transfer of Liquidating Trust Assets.</u>

On the Effective Date, the Liquidating Trust Assets shall be transferred and assigned to the Liquidating Trust, but subject to the Liquidating Trust's obligations under the Plan and Liquidating Trust Agreement and subject to all properly perfected Liens not released pursuant to the terms of this Plan. The Liquidating Trustee, as trustee of the Liquidating Trust, shall be substituted as the plaintiff, defendant, or other party in all lawsuits in which either of the Debtors is, as applicable, a party as of the Effective Date. The conveyance of all Liquidating Trust Assets shall be accomplished pursuant to the Plan and the Confirmation Order, and shall be deemed effective upon the Effective Date. Any Person having a Lien, encumbrance, or other interest against any Liquidating Trust Assets shall be conclusively deemed to have consented to the transfer and assignment of such Liquidating Trust Assets to the Liquidating Trust by failing to object to confirmation of this Plan, except as otherwise provided in this Plan. The Liquidating Trustee may present such Order to the Bankruptcy Court as may be necessary to require third parties to accept and acknowledge such conveyance to the Liquidating Trust. Such Order may be presented without further notice other than as has been given in this Plan.

<u>Issuance of Liquidating Trust Interest.</u>

It is an integral and essential element of this Plan that the offer and issuance of Liquidating

Trust Interest pursuant to this Plan, to the extent such Liquidating Trust Interest constitute securities under the 1933 Act, shall be exempt from registration under the 1933 Act and any State or local law, pursuant to Section 1145 of the Bankruptcy Code and any other applicable exemptions, without limitation. The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Bankruptcy Cases, the Debtors, the Liquidating Trustee, the U.S. Securities and Exchange Commission and all other federal, state and local regulatory enforcement agencies, to the effect that the Liquidating Trustee is successor to the Debtors under this Plan pursuant to Section 1145 of the Bankruptcy Code, that the offer of the Liquidating Trust Interest is occurring pursuant to this Plan, that the offer of the Liquidating Trust Interest is in exchange for any Claim or Equity Interest, and that such offer and issuance, to the extent such Liquidating Trust Interest constitute securities under the 1933 Act, fall within the exemption from registration under the 1933 Act and any state or local law pursuant to Section 1145 of the Bankruptcy Code. In lieu of certificates evidencing the Liquidating Trust Interest, the Liquidating Trustee shall maintain a register of the names, addresses and interest percentages of the Liquidating Trust Beneficiaries based upon the provisions of this Plan, which designate the persons who are entitled to receive the Liquidating Trust Interest. The Liquidating Trust Interest may not be transferred, sold, pledged or otherwise disposed of, or offered for sale except for transfers by operation of law.

<u>Cancellation of Equity Interests</u>.

On the Effective Date, all Equity Interests in the Debtors shall be terminated and extinguished and any certificates that previously evidenced ownership of those Equity Interests shall be deemed cancelled (all without further action by any Person or the Bankruptcy Court) and shall be null and void and such certificates shall evidence no rights or interests in the Debtors, save and except for any duties and responsibilities of the members and managers of DRM Sales and DRM Rental, along with the requisite authority, to prepare and file the final tax returns for the Debtors.

<u>Preservation of Causes of Action and Rights</u>.

All Causes of Action, rights of setoff and other legal and equitable defenses of the Debtors or the Estates are preserved unless expressly released, waived, or relinquished under the Plan or the Confirmation Order, and shall vest in the Liquidating Trust as part of Liquidating Trust Assets. No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that a Cause of Action will not be pursued against them.

**Further, unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims and Causes of Action against third parties not otherwise assigned to Community National Bank or released as part of the CNB Settlement are specifically reserved, including but not limited to any such claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation,**

**control, interference with contractual and business relationships, breach of fiduciary duty, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

Unless expressly released by the Plan or by an Order of the Bankruptcy Court1, the Debtors may hold the following claims, all of which shall be preserved and transferred to the Liquidating Trust pursuant to the terms of this Plan.

- Preference claims under section 547 of the Bankruptcy Code;

- Fraudulent transfer and other avoidance claims arising under section 506, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code and various state laws;

- Unauthorized post-petition transfer claims including, without limitation, claims under section 549 of the Bankruptcy Code;

- Claims and Causes of Action asserted in current litigation, whether commenced pre- or post-petition;

- Counterclaims asserted in current litigation;

- Any and all claims and Causes of Action against any Affiliate of the Debtors, including, without limitation, DRM Transportation, LLC, DRM Management, Inc., DRM Companies, or any other entity sharing common ownership with the Debtors or Don Meek, including, but not limited to, (i) any Cause of Action listed above, (ii) any claims based on any intercompany

---

1 On August 22, 2016, the Bankruptcy Court approved the CNB Settlement, which provided in pertinent part that the Debtors would assign all pre-petition accounts receivable to CNB in accordance with the Bill of Sale, "including, without limitation, all right and authority held by the Debtors or their bankruptcy estates to waive and release any and all claims to avoid and/or recover preferential transfer made by or for the Debtors arising under sections 547 and/or 550 of the Bankruptcy Code, and which are held by the Debtors or their bankruptcy estates against the account obligors with respect to the Pre-petition A/R ('the "Avoidance Claims"), solely to the extent any Avoidance Claim constitutes a valid defense to the payment of any Pre-petition A/R." Nothing in the Plan or the assignment of the avoidance actions under the provisions of the Plan to the Liquidating Trust is intended to abrogate or modify the terms of the Global Settlement Agreement as it relates to the Avoidance Claims.

debt or amounts borrowed by any Affiliate or related company from either of the Debtors, and (iii) any Avoidance Actions, including preference and fraudulent transfer;

- Any and all claims and Causes of Action against Don Meek, including, but not limited to, (i) any Cause of Action listed above, (ii) any claims based upon any amounts borrowed by Meek from either of the Debtors, (iii) breach of fiduciary duty; and (iv) Avoidance Action, including preference and fraudulent transfer;

- Any and all claims and Causes of Action against SB International, Inc., including, but not limited to, (i) any Cause of Action listed above, and (ii) any Avoidance Actions, including preference and fraudulent transfer;

- Any and all claims and Causes of Action, including Avoidance Actions, against any party listed in response to Question No. 3 on DRM Sales' Amended Statement of Financial Affairs [Docket No. 101].

Standing Liquidating Trustee as Representative of the Estates.

The Liquidating Trustee shall be appointed representative of the Estates pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Liquidating Trust Assets. With regard to the Liquidating Trust Assets, the Liquidating Trust may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided herein), settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action transferred to the Liquidating Trust. Except as otherwise ordered by the Bankruptcy Court, the Liquidating Trustee shall be vested with authority and standing to prosecute the Causes of Action transferred to the Liquidating Trust. The Liquidating Trustee and his or her attorneys and other professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action.

## E.    THE LIQUIDATING TRUST

The Liquidating Trust is the sole means in which Allowed Claims will be paid.  As provided in the Plan, on the Effective Date the Liquidating Trust Assets shall be transferred and assigned to the Liquidating Trust.  After the execution of the Liquidating Trust Agreement, it will be the duty of the Liquidating Trustee to administer and liquidate the Liquidating Trust Assets, including bringing, prosecuting and settling any and all Causes of Action, including, but not limited to, any Avoidance Actions, transferred to the Liquidating Trust.

The Liquidating Trustee shall be the person or entity charged with administration of the Liquidating Trust consistent with the terms of the Plan, the Confirmation Order and the Liquidating Trust Agreement.  The Liquidating Trustee shall be chosen pursuant to the provisions of Section 7.4 of the Plan.  Generally, the Committee will suggest or nominate a person to serve as the Liquidating Trustee and all parties shall have the opportunity to object to such nomination.  In the event of an objection, an election shall be held pursuant to Section 7.4.2 of the Plan that holders of Class A7 General Unsecured Creditors may vote on the nominee suggested by the Committee and any other

nominees provided by the parties objecting the Committee's nomination.

The Liquidating Trustee shall be compensated on an hourly basis, not to exceed $250.00 per hour. The Liquidating Trustee may retain professionals to assist in the administration of the Liquidating Trust, and such professional may be initially retained using a portion of the Liquidating Trust Reserve. However, after initial payments are made for retention of such professionals, any further fees of such professionals shall be paid by the Liquidating Trust only after recovery and liquidation of the Liquidating Assets has begun, and such fees shall only be paid to the extent that such fees and expenses are related to Liquidating Assets that have actually been liquidated.

The Plan also provides that the Holders of Allowed Class A7 General Unsecured Claims may elect and agree to serve on the Liquidating Trust Board, as provided for in Section 7.11 of the Plan. The Liquidating Trust Board is not responsible for administering and liquidating the Liquidating Trust Assets, but it does have various rights with respect to the Liquidating Trustee, including the power to appoint a successor, to review his actions and books and records at no cost, to share the attorney-client privilege with him, advise the Liquidating Trustee, and declare the Liquidating Trust to be fully administered, all as more fully agreed to in the Liquidating Trust Agreement. The members of the Liquidating Trust Board shall serve with no compensation. If there is insufficient interest amongst the Holders of the Allowed Class A7 General Unsecured Claims to serve on the Liquidating Trust Board, the plan dispenses with the Liquidating Trust Board all together and all the provisions related thereto.

## F.    RESERVES ADMINISTERED BY THE LIQUIDATING TRUST

Establishment of Reserve Accounts

The Liquidating Trustee shall establish each of the Reserve Accounts (which, notwithstanding anything to the contrary contained in this Plan, may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Liquidating Trustee).

Senior Claim Reserve

On the Effective Date, the Liquidating Trustee shall establish the Senior Claim Reserve by depositing from the PPL Advance and cash on hand the amount estimated to be necessary to satisfy the Allowed Priority Non-Tax Claims, Allowed Administrative Claims, Allowed Professional Claims and Class A1.1, Al.2, A1.3 and A2.1 Claims. If any Cash remains in the Senior Claim Reserve after payment of each the immediately previously enumerated claims, such excess Cash shall be transferred to the Distribution Reserve for Distribution to the holders of the Liquidating Trust Interests.

Liquidating Trust Expense Reserve

On the Effective Date, or as soon as such Cash becomes available, the Liquidating Trustee shall deposit the Liquidating Trust Expense Carve-Out into the Liquidating Trust Expense Reserve. The Cash in the Liquidating Trust Expense Reserve is to be used by the Liquidating Trustee solely to

satisfy the expenses of the Liquidating Trust and the Liquidating Trustee as set forth in the Plan and in the Liquidating Trust Agreement. In the event the Liquidating Trust Expense Reserve is fully exhausted, additional Cash may be deposited into this reserve upon written request, and subsequent approval by the Liquidating Trust Board, if one exists. If any Cash remains in the Liquidating Trust Expense Reserve after payment in full of all expenses of the Liquidating Trust and Liquidating Trustee, such excess Cash shall be transferred to the Distribution Reserve for Distribution to the holders of Liquidating Trust Interest.

### Distribution Reserve

On the Effective Date, the Liquidating Trustee shall establish the Distribution Reserve for the sole benefit of the holders of Liquidating Trust Interests. All Distributions of Cash to the holders of Liquidating Trust Interests shall be made from the Distribution Reserve.

### Disputed Claims Reserve

On the Effective Date, the Liquidating Trustee shall establish the Disputed Claims Reserve for the sole benefit of the holders of Claims subject to a pending objection. The Liquidating Trustee shall deposit into the Disputed Claims Reserve an amount equal to the Pro Rata share of the Distributions allocable to Disputed Claims, in accordance with the distribution scheme contemplated in the Plan, as if such Claims were Allowed Claims. Amounts deposited into the Disputed Claims Reserve shall be held in trust for the benefit of the holders of Disputed Claims pending a determination of their entitlement thereto under the terms of the Plan. Once such Disputed Claim is determined by Final Order or settlement to be an Allowed Claim, the Liquidating Trustee is authorized to pay the Allowed Amount of such Claim, in accordance with the Plan.

## G.    ASSUMPTION OF EXECUTORY CONTRACTS

### General Rejection of Executory Contracts

All executory contracts and unexpired leases of the Debtors (including, but not limited to, those listed on the Debtors' Schedules) which are not expressly assumed or rejected on or before the Effective Date, or not otherwise specifically treated in this Plan or in the Confirmation Order, shall be deemed to have been rejected as of the Petition Date. The Bankruptcy Court shall retain jurisdiction to effectuate any post-confirmation assumption and assignment of leases, and such assumption and assignments shall be performed pursuant to Section 365 of the Bankruptcy Code. The listing by the Debtors in their respective Schedules of a contract or lease as an executory contract or unexpired lease will not constitute an admission by the Debtors that such contract or lease is an executory contract or unexpired lease of the Debtors, or that the Debtors or their Estates have any liability thereunder.

### Claims for Damages

Any Claim based upon rejection of an executory contract or unexpired lease under the Plan must be Filed with the Bankruptcy Court and served on the Debtors, Committee and Liquidating Trustee such that the Claim is actually received within thirty (30) days of the entry of an Order rejecting such contract or lease. All Allowed Claims for rejection damages, unless otherwise specifically provided for or addressed in this Plan, shall be treated as Class A7 or B4 General Unsecured Claims depending on the applicable Debtor. Any Claim not Filed within such time will

be forever barred from assertion against the Debtors, their Estates or the Liquidating Trust.

### Rejection of Pleasanton Lease

On the Effective Date, to the extent any unexpired lease exists related to that certain storage yard located in Pleasanton, Texas, used by the Debtors still exists, such lease is expressly rejected. The Confirmation Order shall constitute an order approving the rejection under the Plan.

### Assumption and Assignment of Weaver Lease

On the Effective Date, the Weaver Lease shall be assumed by the Debtors and immediately and simultaneously assigned to DRM Transportation Services, LLC. To the extent any defaults need to be cured in order to comply with 11 U.S.C. § 365, DRM Transportation Services, LLC irrevocable agrees to undertake any such requirements or obligations to provide adequate assurance as may be required by 11 U.S.C. § 365(b). The Confirmation Order shall constitute an order approving the assumption and assignment of the Weaver Lease and that the assumption and assignment of the Weaver Lease to DRM Transportation Services, LLC conclusively constitutes adequate assurance of payment as required by 11 U.S.C. § 365(b).

### Rejection of Drill Chem Sublease

On the Effective Date, the Drill Chem Sublease shall be rejected. The Confirmation Order shall constitute an order approving the rejection under the Plan.

## H.     RESOLUTION OF DISPUTED CLAIMS

### Standing

Following the Effective Date, the Liquidating Trustee shall have standing to object to Claims.

### Effect of Bar Date

In accordance with Bankruptcy Rule 3003(c), any entity, Person or Creditor whose Claim was listed in the Schedules, or holds a Contingent Claim, Unliquidated Claim, or Disputed claims, and did not file a proof of Claim before the Bar Date, shall not be treated as a Creditor with respect to such Claim for purposes of voting or distribution.

### Objection Deadline

Within one hundred eighty (180) days from the Effective Date, unless such date is extended by Order of the Bankruptcy Court after notice and hearing, the Liquidating Trustee may File with the Bankruptcy Court objections to Claims and Equity Interests and shall serve a copy of each such objection upon the holder of the Claim or Equity Interest to which such objection pertains. Unless arising from an Avoidance Action, any Proof of Claim Filed after the Effective Date shall be of no force and effect and need not be objected to. Any Undetermined Claim may be litigated to Final Order. With the written consent and agreement of the Liquidating Trust Board, the Liquidating Trustee may compromise and settle any Undetermined Claim without the necessity of any further notice or approval of the Bankruptcy Court, and Bankruptcy Rule 9019 shall not apply to any

settlement of an Undetermined Claim after the Effective Date. Nothing in this Plan extends the Bar Date set in the Bankruptcy Cases or grants any Creditor any greater rights with respect to a late-filed Claim than such Creditor otherwise has.

### Creditor Response to Objection

With respect to any objection to a Claim when such objection is Filed after the Effective Date, the Creditor whose Claim was the subject of the objection must File with the Bankruptcy Court and serve a response to the objection upon the Liquidating Trustee no later than thirty (30) days from the date of service of any such objection. Failure to File and serve such a response within the thirty (30) days shall be grounds for the Bankruptcy Court to enter a default judgment against the non-responding Creditor and thereby grant the relief requested in the objection without further notice to such Creditor. Any such objection shall contain prominent negative notice language informing the objected-to creditor of the same.

### No Payment Pending Allowance

Notwithstanding any other provision in the Plan, if any portion of a Claim is Disputed or is an Undetermined Claim, then no payment or Distribution shall be made on account of any portion of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### Allowance of Claims

At the time, and to the extent that a Disputed or an Undetermined Claim becomes an Allowed Claim, such Allowed Claim shall be entitled to such Distributions.  Such Distributions shall be made in the manner provided for by this Plan and the Liquidating Trust Agreement, or any Final Order of the Bankruptcy Court with respect to such Allowed Claim.

## I.  RETENTION OF JURISDICTION

Under the Plan, notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date of the Plan, the Bankruptcy Court shall retain jurisdiction, to fullest extent legally permitted, over the Bankruptcy Cases, all proceedings arising under, arising in or related to the Bankruptcy Cases, the Confirmation Order, the Plan and administration of the Liquidating Trust. Some specific types of disputes and proceedings that the Bankruptcy Court shall retain jurisdiction over are identified in Article XIV of the Plan.

## ARTICLE VII
## VOTING PROCEDURES AND REQUIREMENTS

### A.  VOTING DEADLINE

Each Creditor holding a Claim which entitles the Creditor to vote on the Plan has been provided a Ballot along with this Disclosure Statement. The Ballot is to be used by the Creditor to accept or reject the Plan and to make any elections that are available to the Creditor as indicated by the Ballot.

To ensure that a Ballot is deemed timely and considered by the Balloting Agent, which shall be the Debtors' attorneys, Mullin Hoard & Brown, L.L.P., a Creditor must: (a) carefully review the Ballot and the instructions set forth thereon; (b) provide all of the information requested on the Ballot; (c) sign the Ballot; and (d) return the completed and signed Ballot to the Balloting Agent by the Voting Deadline. By order of the Bankruptcy Court, the "Voting Deadline" is 5:00 p.m. (CST), on November 1, 2016. Therefore, in order for a Ballot to be counted for voting purposes and any applicable election, the completed and signed Ballot must be received at the address specified below by no later than the Voting Deadline.

**DEADLINE:** Must be **RECEIVED** by 5:00 p.m., Central Time
On November 1, 2016

Addressed to:
Mullin Hoard & Brown, L.L.P.
Attn: David Langston
P.O. Box 2585
Lubbock, Texas 79408-2585
Facsimile: (806) 765-0553

## B. CREDITORS SOLICITED TO VOTE

Each Creditor holding a Claim in a Class that is Impaired under the Plan is being solicited to vote on the Plan. As to any Claim for which a Proof of Claim was Filed and as to which an objection has been lodged, however, if such objection is still pending as of the Voting Deadline, the Creditor's vote associated with such Claim will not be counted to the extent of the objection to the Claim, unless and to the extent the Bankruptcy Court temporarily allows the Claim upon motion by such Creditor in an amount determined by the Bankruptcy Court. Such motion must be heard and determined by the Bankruptcy Court prior to the Confirmation Hearing. Further, the Creditor's vote may be disregarded if the Bankruptcy Court determines that the Creditor's acceptance or rejection of the Plan was not solicited or procured in good faith or in accordance with the provision of the Bankruptcy Code.

## C. DEFINITION OF IMPAIRMENT

Pursuant to Section 1124 of the Bankruptcy Code, a Class of Claims is impaired under a Plan unless, with respect to each Claim of such Class, the plan does at least one of the following two (2) things:

1.  leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder of such Claim; or

2.  notwithstanding any contractual provision or applicable law that entitles the holder of

such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default:

(a)     cures any such default that occurred before or after the commencement of the case under the Bankruptcy Code, other than a default of a kind specified in Section 365(b)(2) of the Bankruptcy Code;

(b)     reinstates the maturity of such claim as it existed before the default;

(c)     compensates the holder of such Claim for damages incurred as a result of reasonable reliance on such contractual provision or applicable law; and

(d)     does not otherwise alter the legal, equitable, or contractual rights to which such claim entitles the holder of such Claim.

The Plan identifies the classes of Creditors and Interests that the Debtor believe are Impaired or unimpaired under the Plan. The Plan cannot and does not change the law on what is an impaired class and, to the extent a Creditor disagrees with the Debtor's identification of impaired or unimpaired classes, the Creditor may object to the Plan and the Bankruptcy Court will decide the dispute.

## D.     CLASSES IMPAIRED UNDER THE PLAN

Classes A1.1, A1.2, A1.4, and A2.1 are Unimpaired. Accordingly, under section 1126(f) of the Bankruptcy Code, those Classes are conclusively deemed to have accepted the Plan and are not entitled to vote in respect of the Plan.

Classes A1.3, A2.2, A3, A4, A5, A6, A7, B1, B2, and B3 are Impaired. Therefore, the holders of Allowed Claims in those Classes are being solicited for votes in favor of the Plan.

Classes A8, A9, B3, B4, B5, and B6 are also Impaired. Additionally, Claims in those Classes will not receive any distributions or property under the Plan. Accordingly, under section 1126(g) of the Bankruptcy Code, holders of Allowed Claims in each of those Classes are conclusively deemed to have rejected the Plan and are not eligible to vote on the Plan.

## E.     VOTE REQUIRED FOR CLASS ACCEPTANCE

Pursuant to the Bankruptcy Code, a Class of Claims under the Plan shall be deemed to have accepted the Plan if the Plan is accepted by Creditors holding at least two-third (2/3) in amount and more than half (1/2) in number of the Claims within such Class who are entitled to vote and who actually vote using a properly completed and signed Ballot which is returned to the Balloting Agent by no later than the Voting Deadline. It is important to note that, pursuant to the Bankruptcy Code, a Class vote in favor of the Plan will be binding even on those creditors in the Class who vote against

the Plan, so long as the requisite voting percentages are obtained in favor of the Plan.

## ARTICLE VIII
## CONFIRMATION OF THE PLAN

### A.      BRIEF EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Under Chapter 11, an attempt is made to restructure the Debtors' finances so that the Debtors may both continue to operate their business and repay their creditors.  Alternatively, the chapter 11 plan may provide for the liquidation of the Debtors' assets, with the properties subject to security interests going to the respective secured creditors and all remaining property satisfying, first, administrative claims and priority claims, and, secondly, general unsecured claims.  Formulation of a Plan of Reorganization is the primary purpose of a reorganization proceeding under Chapter 11.

The Plan sets forth and governs the treatment and rights to be afforded to creditors, other claimants, and equity interest holders with respect to their claims against, and interests in the Debtors' assets.  According to Section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited only after a written Disclosure Statement approved by the Bankruptcy Court as containing adequate information has been provided to each creditor or equity interest holder.  This First Amended Joint Disclosure Statement is presented to creditors and interest holders to satisfy the disclosure requirements contained in Section 1125 of the Bankruptcy Code.

### B.      CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to holder a hearing on confirmation of the Plan. Section 1128(b) provides that any party in interest may object to confirmation of the Plan. The Confirmation Hearing has been scheduled for: Tuesday, November 8, 2016 at _1:45 P.M.in the United States Bankruptcy Court for the Western District of Texas, 100 East Wall Street, Midland, Texas, Room P126.

Any objection to confirmation of the Plan must be in writing and such objection must be Filed with the Bankruptcy Court and served on each of the following parties by no later than 4:00 p.m. (CST) on November 1, 2016.

| | |
|---|---|
| Debtors: | Counsel for the Debtors: |
| DRM Sales & Supply, LLC | Mullin Hoard & Brown, L.L.P. |
| DRM Rental Properties, LLC | Attn: David R. Langston |
| | P.O. Box 2585 |
| | Lubbock, Texas 79408-2585 |
| | |
| United States Trustee: | Counsel for the Committee |
| | Pronske Goolsby & Kathman, P.C. |

Attn: Jason P. Kathman
901 Main Street, Suite 610
Dallas, Texas 75202

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED AND SERVED, IT SHALL NOT BE CONSIDERED BY THE BANKRPUTCY COURT AND SHALL BE DEEMED WAIVED.**

### C.     MODIFICATION OF THE PLAN

Section 1127(a) of the Bankruptcy Code permits the Debtors to amend or modify a plan at any time prior to confirmation.  Post-confirmation modifications of a plan are allowed under Section 1127(b), if the proposed modification is offered before a plan has been substantially consummated or pursuant to an article of the confirmed plan authorizing the intended modification. Debtors reserve the right to amend or modify the Plan at any time at which such modification is permitted under the Bankruptcy Code.

In the event the Debtors propose to modify the Plan prior to the Confirmation Order, further disclosures pertaining to the proposed modification will be required only if the Bankruptcy Court finds, after a hearing, that the pre-confirmation modifications adversely change the treatment of any creditor or equity security interest holder who has previously accepted the Plan.  If the proposed pre-confirmation modification is material and adverse, or if a post-confirmation modification is sought, the Debtors intend to supplement this Disclosure Statement as necessary to describe the changes made in the Plan and the reasons for any proposed modifications.

In the event that any impaired class of claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."  A Plan of Reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for its claims or equity security interests.  "Fair and equitable" has different meanings for secured claims and unsecured claims.

With respect to a secured claim, "fair and equitable" means either:  i) the impaired secured creditor retains its liens to the extent of its allowed claim and receives deferred cash payments at least equal to the allowed amount of its claim with a present value on the effective date of the Plan at least equal to the value of such secured creditor's interest in the property securing its liens; or ii) property subject to the lien of the impaired secured creditors is sold free and clear of that lien, with that lien attaching to the proceeds of the sale, and such lien proceeds must be treated in accordance with clauses (i) and (iii) hereof; or iii) the impaired secured creditor realizes the "indubitable equivalent" of its claim under the Plan.

With respect to an unsecured claim, "fair and equitable" means either i) each impaired unsecured creditor receives or retains property of a value equal to the amount of its allowed claim; or ii) the holders of the claims and equity security interests that are junior to the claims of the dissenting class will not receive any property under the Plan.

In the event one or more classes of impaired claims rejects the Plan, the Bankruptcy Court will determine at the hearing for confirmation of the Plan whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims. If the Bankruptcy Court determines that the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of claims, the Bankruptcy Court can confirm the plan over the objection of any impaired class.

# ARTICLE IX
## LIQUIDATION AND PLAN ALTERNATIVES

The alternative to a chapter 11 plan of reorganization would be a Chapter 7 liquidation, whereby the assets of the bankruptcy estate would be liquidated and proceeds distributed to the Creditors.  While the Debtors are proposing a liquidating plan, the Debtors believe an orderly liquidation of the Debtors assets as provided in the Plan will provide a greater distribution to creditors than conversion to a Chapter 7. Because of the intercompany payables between the Debtors, the conversion of the Debtors' cases to Chapter 7 will most likely result in the appointment of two Chapter 7 trustees, one for DRM Sales and one for DRM Rental. Conversion to Chapter 7 will require the appointed Chapter 7 Trustees to get up to speed on the Debtors bankruptcy cases. Most likely this will require the hiring of professionals for the Chapter 7 trustees that have not been involved with the bankruptcy cases. These professionals will likewise need to get up to speed on the bankruptcy cases, increasing administrative costs to the bankruptcy estates. Liquidating under the Debtors' Plan will not require the additional administrative costs to the bankruptcy estates.

Additionally, a Chapter 7 Trustee is entitled to a commission for any distribution it makes to creditors under the Bankruptcy Code. The commission is treated as an administrative expense. The Debtors project that the commission to the Chapter 7 Trustee could be in the approximate amount of $63,000.00. Liquidating under the Debtors' Plan will not create an administrative expense as the Debtors are not entitled to a commission for property distributed to creditors under the Plan.

Finally, the Debtors believe its knowledge of its books and records, assets, and liabilities assists the Debtors in maximizing the value of its assets, increasing the potential distribution to creditors. Conversion to Chapter 7 and the appointment of a Chapter 7 trustee may result in the loss of this knowledge as the Debtors employees will be let go.

Attached as **Exhibit A** is an analysis of the expenses and recoveries that Creditors could expect under the terms of the Plan as confirmed. In a Chapter 7 liquidation of the Debtors  the administrative expenses would be greater due to the necessity of paying Chapter 7 trustee commissions. It is also anticipated that the professionals hired by the Chapter 7 trustee would be entitled to significant fees and expenses over and above those anticipated to be expended by the Liquidating Trustee as proposed under the terms of the Plan.

# ARTICLE X
# RISK FACTORS

## A.     ESTIMATED RECOVERY RISKS

The Liquidating Trust Assets can be characterized as four main types of assets: (1) the net cash proceeds from the sale of personal property described in Section 6.1 of the Plan, (2) the DRM Yard, (3) recovery of intercompany obligations, including the DRM Transportation Receivable and Meek Payable, and (4) Avoidance Actions. By way of a global comment, the main risk the Debtors perceive with the Plan is the ability to maximize the value of the assets for sale to acquire the most for its creditors. Currently the oil and gas industry has been struggling, and there have been many companies experiencing the same financial difficulties as the Debtors. The market may be flooded with similar assets as the Debtors intend to sell in which case the value of the Debtors' assets will be less.

The Debtors do not perceive there to be substantial risks associated with the sale of the personal property being sold pursuant to Section 6.1 because the auctioneer is confident in the sale proceeds and has advanced $500,000.00 based upon that belief.

The risks associated with the DRM Yard are much greater. The DRM Yard is currently encumbered with a lien to CNB. The DRM Yard is being transferred to DRM Sales and subsequently to the Liquidating Trust subject to CNB's lien against the DRM Yard. The CNB Real Estate Claim is $4,110,517.34 based on its Proof of Claim. To the extent that the DRM Yard sells for less than the amount of the CNB Real Estate Claim, there will likely be no net proceeds to be distributed to holders of Liquidating Trust Interests.

The recovery of the intercompany obligations from DRM Transportation and Don Meek pose risks that are inherent in any litigation and collection matter. The Debtors and Committee are fairly certain of liability on the intercompany obligations and thus any risks comes from collections of those amounts. Specifically, the Debtors have already espoused in their Schedules that they do not believe the entire amount of the intercompany obligations are collectable.

Recovery on the Avoidance Actions also includes risk associated with litigation. Neither the Debtors nor the Committee have completed a full analysis of the various Avoidance Actions and what defenses may exist. However, a preliminary investigation appears to show that there were a considerable amount of transfers subject to Avoidance Actions and those actions appear to be viable claims.

## B.     BANKRUPTCY RISKS

<u>Claim of IRS.</u>  The IRS has filed proofs of claim in both Debtors' cases claiming a priority tax claim in the amount of $206,730.09. The Debtors, as pass through entities, assert they are not liable for this debt and intend to file objections to the IRS's proofs of claim. Nonetheless, the Debtors face the risk that the Court, after conducting a hearing on their objections, determines that the Debtors are severally liable with DRM Management Company, Inc. for the 2014 tax claim of $206,730.09. Should the Court determine the IRS's proofs of claim are valid, then the IRS's Allowed Claim shall be treated in accordance with the treatment set forth for Class A1.3.

<u>Insufficient Acceptances</u>.      For the Plan to be confirmed, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan.  With regard to such impaired voting Classes, the Plan will be deemed accepted by a Class of Impaired Claims if the Plan is accepted by claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted.  On those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.  The Debtors intend to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan.  However, there can be no assurance that any Impaired Class of Claims under the Plan will accept the Plan or that the Debtor would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

<u>Confirmation Risks</u>.    The following specific risks exist with respect to confirmation of the Plan:

- Any objection to confirmation of the Plan can either prevent confirmation of the Plan, or delay such confirmation for a significant period of time.
- Since the Debtors may be seeking to obtain approval of the Plan over the rejection of one or more impaired Classes of Claims, the cramdown process could delay confirmation.

# ARTICLE XI
# CERTAIN FEDERAL INCOME TAX CONSEQUENCES
# OF THE PLAN AND SECURITIES LAW CONSIDERAIONS

The following discussion summarizes certain U.S. federal income tax consequences to the Debtors and certain holders of Allowed Claims of the implementation of the Plan and the formation of and conveyances to the Liquidating Trust. This summary is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular Debtor or holder of an Allowed Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. Legislative, judicial or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or new interpretations may have retroactive effect and could significantly affect the U.S. federal income tax consequences of the Plan described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of

counsel with respect to any of the tax aspects of the Plan or the formation of and conveyances to the Liquidating Trust. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this discussion does not address foreign, state or local tax consequences of the Plan or the formation of and conveyances to the Liquidating Trust, nor does it purport to address the U.S. federal income tax consequences of the Plan or the formation of and conveyances to the Liquidating Trust to (i) special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and holders of Claims or Equity Interests who are themselves in bankruptcy) or (ii) holders not entitled to vote on the Plan, including holders whose Claims or Equity Interests are to be extinguished without any Distribution. Holders of Allowed Claims should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

This discussion assumes that holders of Claims or Equity Interests hold only Claims or Equity Interests in a single Class. Holders of multiple Classes of Claims or Equity Interests should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below. This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AS MANDATED BY SECTION 1125 OF THE BANKRUPTCY CODE AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS UNDER THE TAX CODE, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY, AND (3) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED UPON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN TAX ADVISOR.**

<u>Tax Status of the Debtors</u>.        Both Debtors, DRM Sales and DRM Rental, are classified as a

pass through entity for U.S. federal income tax purposes. Accordingly, all items of income, gain, loss, deduction, and credit of the Debtors, for U.S. federal income tax purposes (such as gains, losses, and cancellation of indebtedness income from effectuation of the Plan), will be taken into account by the person(s) who owned Equity Interests in the Debtors prior to the Effective Date.

## A.    TAX CONSEQUENCES TO THE DEBTORS

The Debtors will generally realize gain or loss on the sale, or transfer to the Liquidating Trust, of the Liquidating Trust Assets equal to the difference between (i) the amount realized on the sale and the fair market value of the assets transferred to the Liquidating Trust, and (ii) its adjusted tax basis in the assets sold or transferred. The character of any gain or loss as capital or ordinary, and in the case of capital gain or loss, as short term or long term will depend upon the nature of assets sold or transferred and the Debtors' holding period for the assets.

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted such amount. The Debtors should not have COD income (as defined below) from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to § 108(e)(2) of the Internal Revenue Code.  Further, the discharge of a recourse debt obligation by a debtor for an amount of Cash and/or fair market value of property that is less than the adjusted issue price of the debt obligation (as determined for U.S. federal income tax purposes) gives rise to cancellation of indebtedness ("COD") income, which must be included in the debtor's income, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the canceled debt would have given rise to a tax deduction). A specific statutory exception applies to certain debtors if the discharge of indebtedness is granted in a case under Title 11 of the United States Code (relating to bankruptcy) and pursuant to a plan approved by a bankruptcy court in such case. A separate exception applies to taxpayers if the discharge occurs when the taxpayer is insolvent.  In the case of debtors that are pass through entities, both of the aforementioned statutory exceptions must be applied at the partner level. Unless an exception applies, the owners of Equity Interests of the Debtors will realize their distributive share of COD income realized by the Debtors as a result of the Plan to the extent an Allowed Claim is cancelled for no consideration, or in exchange for Cash or other assets conveyed, if any, that in the aggregate is less than the adjusted issue price of the Allowed Claim.

For the foregoing reasons, the precise amount of taxable gain or loss, COD income, or both, which the Debtors, and hence the owners of Equity Interests of the Debtors will realize as a result of effectuation of the Plan cannot be determined until the date of the exchange.

## B.    TAX CONSEQUENCES TO CREDITORS

The tax consequences of the implementation of the Plan and formation of the Liquidating

Trust to Creditors will depend in part, on the type of consideration received by the Creditor in exchange for its Allowed Claim, whether the Creditor reports income on the accrual or cash basis, whether the Creditor receives consideration in more than one tax year of the Creditor, whether the Creditor is a resident of the United States, and whether all consideration received by the Creditor is deemed to be received by that Creditor in an integrated transaction. The tax consequences of the receipt of Cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

Receipt of Cash and Other Property.   A Creditor who receives Cash and/or other property (including Liquidating Trust Interests deemed received as discussed below) in satisfaction of its Claim generally will recognize gain (or loss) on the exchange equal to the difference between the amount of any Cash and the fair market value of any property received (not allocable to interest) and the Creditor's tax basis in its Claim. The character of any gain or loss as capital or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the Holder; (iv) whether the Claim has been held by the holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount. Creditors should consult their own tax advisors regarding the amount and character of gain or loss, if any, to be recognized by them under the Plan.

Receipt of Interest.      Consideration received by a Creditor that is attributable to accrued interest not previously included in taxable income should be treated as ordinary income, regardless of whether the Creditor's existing Claims are capital.  Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or possibly a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claim was previously included in the holder's gross income but was not paid in full by the Debtors. The extent to which the consideration received by a holder of an Allowed Claim will be attributable to accrued interest is unclear.

Market Discount.      The Tax Code generally requires holders of debt instruments with "market discount," (generally, the amount by which the "adjusted issue price" of a debt instrument (i.e., the sum of its issue price plus accrued original issue discount) exceeds the holder's adjusted tax basis in such debt instrument), to treat as ordinary income any gain realized on the disposition of such debt instruments to the extent of the market discount accrued during the holder's period of ownership. Holders should consult their own tax advisors as to the potential application of the market discount rules to them in light of their individual circumstances, and the advisability of making an e lection to accrue market discount on a current basis.

Backup Withholding. Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding." Withholding generally applies if the holder: (a) fails to furnish his social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or

dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax, but merely an advance payment, which may be refunded or credited against such holder's U.S. federal income taxes. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

## C.     TAX CONSEQUENCES OF THE LIQUIDATING TRUST

Classification of the Liquidating Trust.

The Liquidating Trust will be organized for the primary purpose of liquidating the Liquidating Trust Assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonable necessary to, and consistent with, it's liquidating purpose.  Thus, the Liquidating Trust is intended to be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d). Under the Plan, all relevant parties are required to treat the Liquidating Trust as a liquidating trust, subject to definitive guidance to the contrary from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to Sections 671 et seq. of the Tax Code, owned by the Persons who transfer assets to it.

Although the Liquidating Trust has been structured with the intention of complying with guidelines established by the IRS in Rev. Proc. 94-45, 1994-2 C.B. 684, for the formation of a liquidating trust, it is possible that the IRS could require a different characterization of the Liquidating Trust, which could result in a different and possibly greater tax liability to the Liquidating Trust or the holders of the Liquidating Trust Interests. No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust, and there can be no assurance that the IRS would not (or will not) take a contrary position to the classification of the Liquidating Trust.  If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the U.S. federal income tax consequences to the Liquidating Trust and the holders of the Liquidating Trust Interests could be materially differently from those discussed herein. The following discussion assumes treatment of the Liquidating Trust as a grantor trust for U.S. federal income tax purposes.

Creation of the Liquidating Trust

If the Liquidating Trust is treated as a "liquidating trust" then, upon its creation, each holder of a Liquidating Trust Interest will be treated as having received and as owning an undivided interest in the assets of the Liquidating Trust in exchange for its Allowed Claim followed by a transfer by the Liquidating Trust Beneficiary of such Liquidating Trust Assets to the Liquidating Trust. Under the Plan, all parties (including, without limitation, the Debtor, the Liquidating Trustee, the Liquidating Trust and the Liquidating Trust Beneficiaries) are required to report consistently with the foregoing for federal and applicable state and local income tax purposes. The basis of each Liquidating Trust Beneficiary's interest in the Liquidating Trust Assets received will be equal to its fair market value

as of the Effective Date. The fair market value of the portion of the Liquidating Trust Assets that is treated as having been transferred to each Liquidating Trust Beneficiary will be determined, pursuant to the Liquidating Trust Agreement, by the Liquidating Trustee, and all parties must utilize such fair market values determined by the Liquidating Trustee for federal and applicable state and local income tax purposes. The determination of the fair market value of a holder's Liquidating Trust Interest is factual in nature and the IRS may challenge any such determination.

<u>Allocation of Income and Loss and Disposition of Liquidating Trust Assets.</u>

Each holder of a Liquidating Trust Interest must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. Deductions attributable to activities and administrative expenses of the Liquidating Trust may be subject to limitation in the hands of the holders of the Liquidating Trust Interests. Upon the sale or other disposition of any Liquidating Trust Assets, each holder of a Liquidating Trust Interest must report on its U.S. federal income tax return its share of any gain or loss measured by the difference between (i) its share of the amount of Cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating Trust Asset so sold or otherwise disposed of, and (ii) such holder's adjusted tax basis is in its share of such Liquidating Trust Assets. The character of any such gain or loss to any such holder will be determined as if such holder itself had directly sold or otherwise disposed of such Liquidating Trust Asset. The character of items of income, gain, loss, deduction and credit to any holder of a Liquidating Trust Interest, and the ability of such holder to benefit from any deductions or losses, will depend on the particular circumstances or status of any such holder.

As a grantor trust, each holder of a Liquidating Trust Interest has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or other disposition of a Liquidating Trust Asset). Accordingly, holders of a Liquidating Trust Interest may incur a tax liability as a result of owning a beneficial interest in the Liquidating Trust, regardless of whether the Liquidating Trust distributes Cash or other proceeds from the Liquidating Trust Assets. Although the Liquidating Trust provides that it will generally make Cash distributions at least semi-annually, due to the Liquidating Trust's requirements to satisfy certain liabilities, and due to possible differences in the timing of income on, and the receipt of Cash from, the Liquidating Trust Assets, a holder of a Liquidating Trust Interest may, in certain years, be required to report and pay tax on a greater amount of income than the amount of Cash received from the Liquidating Trust by such holder in such year.

<u>Reserve for Disputed Claims.</u>

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidating Trustee will (a) treat all Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim, and (b) to the extent permitted by applicable law,

report consistently with the foregoing for state and local income tax purposes. Accordingly, all Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims will be subject to tax annually on a separate entity basis on any net income earned with respect to the applicable trust assets, and all distributions from this separate trust will be treated as received by holders in respect of their Disputed Claims as if distributed by the Debtor. All parties (including, without limitation, the Debtor, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

## D. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AS MANDATED BY SECTION 1125 OF THE BANKRUPTCY CODE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## E. SECURITIES LAW CONSIDERATIONS

The Liquidating Trust Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by operation of law. The offer and issuance of the Liquidating Trust Interests will be made without registration under the 1933 Act, or under any state securities laws. To the extent the Liquidating Trust Interests constitute securities, the offer and issuance of the Liquidating Trust Interests will be made in reliance upon the exemption from registration afforded by Sections 1125 and 1145 of the Bankruptcy Code. The Confirmation Order will include provisions to the effect that such exemptions are applicable to the offer and issuance of the Liquidating Trust Interests and that the Liquidating Trust is a "successor" to Debtors within the meaning of Section 1145 of the Bankruptcy Code. No indenture will be qualified under the Trust Indenture Act of 1939, as amended (the "1939 Act"), with respect to the Liquidating Trust in reliance on the exemption provided by sect ion 304(a)(1) of the 1939 Act.

Section 1145 of the Bankruptcy Code exempts the offer or sale of securities pursuant to a plan of reorganization or liquidation from the registration requirements of the 1933 Act and from registration under state securities laws if the following conditions are satisfied: (i) the securities are offered and sold by a debtor or a successor of the debtor under a plan of reorganization or liquidation; (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor; and (iii) the securities are issued in exchange for the recipients' claims against or interests in the debtor or principally in such exchange and partly for cash or property. In general, offers and sales of securities made in reliance on the exemption afforded under Section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering, so that the recipients thereof, other than underwriters (as defined in Section 1145(b) of the Bankruptcy Code), are free to resell such securities without registration under the 1933 Act. In addition, such

securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, as noted above, the Liquidating Trust Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by operation of law.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES PURSUANT TO SECTIO 1125 OF THE BANKRUPTCY CODE. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES AND BANKRUPTCY MATTERS DESCRIBED HEREIN.  IN LIGHT OF THE OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTOR ENCOURAGES EACH CREDITOR, EQUITY INTEREST HOLDER, LIQUIDATING TRUST BENEFICIARY, AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

Certain Rights Unaffected.  Except as otherwise provided in the Plan, any rights or obligations which the Debtor's Creditors may have amongst them as to their respective claims or the relative priority or subordination thereof are unaffected.

Binding Effect.  As of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims, and their respective successors and assigns.

15.1      Compliance with Regulations of the Office of the U.S. Trustee. During the pendency of these Proceedings, the Debtors will comply with all regulations promulgated by the Office of the U.S. Trustee, including remaining current on all quarterly fees assessed against the Estate by the U.S. Trustee. Upon confirmation of the Plan, and until a final decree is entered in the Bankruptcy Cases, the Liquidating Trustee shall file the required quarterly reports and pay the fees due under the provisions of 11 U.S.C. section 1930(a)(6) on behalf of DRM Sales, and the management of DRM Rental shall similarly file the quarterly reports and pay the fees on behalf of DRM Rental

Notices.  All notices, requests or demands in connection with the Plan shall be in writing and shall be deemed to have been given when received or, if mailed, five (5) days after the date of mailing, provided such writing shall have been sent by registered or certified mail, postage prepaid, return receipt requested, and sent to the following parties, addressed to:

**Debtors' Counsel:**

David R. Langston
MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806)765-7491
Facsimile: (806) 765-0553

**Committee's Counsel:**

Jason P. Kathman
Pronske Goolsby & Kathman, P.C.
901 Main Street, Suite 610
Dallas, Texas  75202
(214) 658-6511 – Telephone
(214) 658-6509 – Facsimile

All notices and request to holders of Claims and Interests shall be sent to them at the address listed on the last-filed Proof of Claim and if no Proof of Claim is filed, at the address listed in the Debtors' Schedules.

## CONCLUSION

The Debtors respectfully submit that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest of creditors" and "feasibility" requirements and that it should be confirmed even in the event a class of claims does not vote for acceptance of the Plan.  The Debtors believe that the Plan "is fair and equitable" and "does not discriminate unfairly."  Additionally, the Debtors believes that the Plan has been proposed in good faith.

The Debtors respectfully request that this Disclosure Statement be approved for circulation to the creditors of the Debtors and that it be permitted to solicit votes for acceptance of the Plan.

The Debtors further urges holders of Claims in any impaired Class to vote to ACCEPT the Plan and to evidence such acceptance by returning their ballots so that they will be received on or before 5:00 p.m. (CST), on November 1,, 2016.

DATED: September 30, 2016

Respectfully submitted,

MULLIN HOARD & BROWN, L.L.P.
P.O. Box 2585
Lubbock, Texas 79408-2585
Telephone: (806)765-7491
Facsimile: (806) 765-0553

By   /s/ David R. Langston
        David R. Langston:  SBN 11923800
        Brad W. Odell:  SBN 24065839
**_Attorneys for Debtors, DRM Sales & Supply, LLC
and DRM Rental Properties, LLC_**

## EXHIBIT "A"

### ESTIMATED PAYMENTS UNDER TERMS OF LIQUIDATING TRUST
[Calculated According to the Status of the Case on September 15, 2016]

## I. SECURED CREDITORS

| Name of Creditor | Description of Asset/Collateral | Liquidation Value of Collateral/Source of Estimated Value | Amount of Secured Claim | Amount of Equity/(Deficiency) |
|---|---|---|---|---|
| Community National Bank/West Texas National Bank | 1st lien security interest in cash, accounts receivable and inventory | Pipe Inventory = $3,400,000<br><br>Accounts Receivable = $2,678,000<br><br>Cash = $2,927,000<br><br>(Best estimates of DRM management)<br><br>TOTAL = $9,005,000 | $11,775,000 | $0.00<br><br>[Waived as per terms of settlement] |
| | 1st lien deed of trust against Midland Yard facility | Midland Yard facility = $4,100,000<br><br>(Agreed value between Debtors and bank) | $4,100,000 | $0.00<br><br>[Waived as per terms of agreed Plan treatment] |
| Ford Motor Credit | PMSI and certificate of title lien against:<br><br>• 2013 Ford F-150 | $23,755<br><br>(Scheduled value) | $19,511 | $4,244.00 |

| | | | | |
|---|---|---|---|---|
| | truck & | | | |
| | • 2013 Ford Edge vehicle | | | |
| Bank of the West | PMSI against a 2011 Clark C25 Forklift | $9,510.00 (Scheduled value) | $9,510.00 | $0.00 |
| John Deere | PMSI against a 2012 John Deere 544K | $40,000.00 (Scheduled value) | $9,330.00 | $30,670.00 |

## II.  UNSECURED CREDITORS

### A. Unsecured Priority Claims:                                                    $ 577,940.00

1. Administrative Claims                          $274,036
   - Mullin Hoard & Brown (Debtors' attorneys) -- $150,000
   - Pronske Goolsby & Kathman (Creditors' Committee Counsel) -- $35,000
   - Richard McKeel (Special Counsel for DRM Rental) -- $15,000
   - 66% of 2016 property taxes (As per terms of CNB Settlement) -- $74,036

2. Federal Tax Claims (IRS 2014 taxes)           $206,730

3. State and County Taxes                        $97,174
   - Texas State Comptroller -- $18,750
   - New Mexico Taxation & Revenue Dep't -- $25,291.00
   - Priority Pre-petition Ad Valorem Tax Claims -- $16.306
   - Priority Non-Tax Claim of UPCO, Inc. -- $36,827.00

### B. Estimated Allowed Unsecured Claims :                                        $7,262,000.00

   - Estimated Trade Claims -- $7,262,000
   - Deficiency Claim of CNB -- $-0-

### III. UNENCUMBERED ASSETS

| Description of Assets | Approximate Value/Equity |
|---|---|
| Proceeds held in IOLTA Trust Account | $290,519.00 |
| Estimated proceeds from sale of DRM Sales machinery & equipment | $300,000.00 |
| Estimated recovery from DRM Transportation intercompany receivable | $400,000.00* |
| Estimated recovery from Donald Meek note receivable | $300,000.00* |
| Estimated recovery from sale of DRM Rental Midland Yard facility | -0- |
| Estimated recovery from sale of DRM Desert Rose trailer park and four modular homes | $80,000.00 |
| Estimated recovery from preference and/or fraudulent conveyance actions (60% of total estimated preferences) | $1,750,000.00 |
| **TOTAL ESTIMATED VALUE OF ASSETS IN LIQUIDATING TRUST** | **$3,120,519.00** |

(*This figure is strictly an estimate for purposes of the Waterfall Analysis. The use of this figure herein is not to be construed as any waiver or admission by the Debtors, the Unsecured Creditors' Committee, Donald R. Meek, or their respective counsel that this figure accurately reflects the amount which is recoverable from either Donald R. Meek or DRM Transportation, and is without prejudice to any legal claims of the respective parties or their right to assert such amount is more or less than the figures reflected herein.)

### WATERFALL ANALYSIS OF PAYMENTS FROM LIQUIDATING TRUST

| | |
|---|---|
| **Estimate of Available Funds** | **$3,120,519.00** |

**Estimated Liquidating Trust Fees and Expenses:**

| | |
|---|---|
| -     **Real Estate Commissions (6% on real estate)** | **$ 0.00** |
| -     **Associated Closing Costs on real estate** | **$ 10,000** |
| -     **Auctioneer Fees on Equipment** | **$ 60,000** |
| -     **Auctioneer Expenses for advertising, moving, etc.** | **$ 15,000** |
| -     **Attorneys' Fees** | **$150,000** |
| -     **Trustee's Commissions** | **$150,000** |

| | |
|---|---|
| **Total Costs of Administration** | **$385,000** |
| **Payment to Administrative Claimants** | **$274,036** |
| **Payment to Federal Tax Claims (IRS 2014 taxes)** | **$206,730** |
| **Payment to State & County Tax Claims** | **$ 97,174** |
| **Total Estimated Funds Available to Pay Unsecured Claims** | **$2,157,579.00** |
| **Total Unsecured Creditors** | **$9,012,000.00*** |
| **Estimated Percentage Returned to Unsecured Creditors** | **24% of the Claim** |

(*This figure assumes collection of sixty percent (60%) of the preference claims – an estimated $1,750,000 -- in which case the amount collected from each recipient of a preference would be added to the total of unsecured claims participating in the distributions from the Liquidating Trust.)